## COHAN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 114.

Circuit Court of Appeals, Second Circuit.

March 3, 1930.

Arthur F. Driscoll and O'Brien, Malevinsky & Driscoll, all of New York City (Holmes, Brewster & Ivins, of Washington, D. C., of counsel; Frank B. Meseke, of New York City, on the briefs), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, Andrew D. Sharpe, and Randolph C. Shaw, Sp. Assts. Atty. Gen. (C. M. Charest, Gen. Counsel, and Allin H. Pierce, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before L. HAND, SWAN, and MACK, Circuit Judges.

L. HAND, Circuit Judge.

In the year 1918 Cohan was a theatrical manager and producer, doing business in partnership with one Harris. He had originally been an actor like his father and mother, with whom while a boy he had begun to act in vaudeville. After 1899 the parents with their two children, Cohan and his sister, divided their earnings, one quarter to each of the children and a half to the parents, the petitioner collecting for all and distributing. In that year they employed a manager and after his death another, who married the daughter in 1905 and with her left the group. The other three then employed Harris as their manager, and made a change in the distribution. Cohan had begun to write plays, on which he was getting royalties, which he first withdrew from the net earnings. The parents next took out five hundred dollars a week, and the four divided what was left, half to Harris, a quarter to Cohan, and the rest to the parents. Before 1914 Cohan and his father had left the stage and spent their time in directing their plays, until the father died on July 31, 1917.

On his father's birthday, in January, 1914, Cohan as an expression of affection wrote a letter to him, the only relevant parts of which declared that the two were, and had for years been, partners in all Cohan's enterprises. The mother had left the stage and was not engaged in helping her son when the father died. Shortly afterwards Cohan told her that his father's estate "was to be hers, that he wanted her to remain interested in their business affairs and that these affairs would be conducted as they had been in the past." Thereafter he always divided equally with her his profits from the firm of Cohan & Harris, as he had done with his father. On June thirtieth, 1920, he and Harris separated and Cohan continued alone, continuing to give her half his net profits.

The first question is whether upon the foregoing facts the Board was right in fixing Cohan's income as the whole of what he received from the firm of Cohan & Harris, while it lasted, and later as the whole of his own profits. He maintains that his mother was always his partner, and that he is entitled to deduct from his receipts the sums which he paid to her. If the father was a partner at the time of his death, that partnership ended and Cohan, the survivor, had to account to the legatees or next of kin. We do not know whether there was a will, but we may assume that there was none, as no mention is made of one. If so, the widow and each child took a third, but we are left in the dark as to what were the assets. They could not have included those of the firm of Cohan & Harris, of which the father was not a member, because although he helped Cohan in writing his plays, there is nothing in the findings to show that Harris was privy to this, or that he recognized him as an associate. The assets of the supposed firm of Cohan & Cohan were not therefore shown to have been more than such profits as might come to hand out of Cohan's share from Cohan & Harris, and of these the daughter had a third. Therefore, when Cohan told his mother that his father's estate "was to be hers," at most he did no more than increase her share of his undistributed profits from one to two thirds. There is no evidence that any part of these entered into his income for 1918, and the later years; or, if so, what that part was. The petitioner has therefore on any theory failed in his proof pro tanto.

Moreover, he did not create a new partnership between himself and his mother at the same interview. The relevant law of New York at the time was section two of the Partnership Law of 1909 (Laws N. Y. 1909, c. 44 [Consol. Laws N. Y. c. 39]), which defined a partnership as an "association * * * of two or more persons who have agreed to combine their labor, property and skill, or some of them, for the purpose of engaging in any lawful trade or business, and sharing the profits and losses, as such, between them." In October, 1919 (Laws 1919, c. 408), the Uniform Partnership Act became a law in New York, the definition in section ten of which is: "An association of two or more persons to carry on as co-owners a business for profit." "Combine" in the first act is probably the equivalent of "co-owners" in the second, and it is difficult to see any substantial difference between the two. At any rate it is clear that neither Cohan nor his mother intended to carry on a joint business, for it does not appear that she had the least direction of his affairs, or any part in the conduct of the business. What he apparently meant was to give her half his earnings in consideration of his filial affection for her, and for her assistance in his early unprosperous years. However this unusual gratitude may affect our estimate of his character, we have only to consider whether he had changed his legal rights. There can be no doubt that he remained always free to stop his payments, and that her share depended on the endurance of his feelings toward her.

The Uniform Partnership Act has been similarly understood in New York (Martin v. Peyton, 246 N. Y. 213, 158 N. E. 77), and elsewhere (Giles v. Vette, 263 U. S. 553, 44 S. Ct. 157, 68 L. Ed. 441; In re Hoyne, 277 F. 668 [C. C. A. 7]; Petition of Williams, 297 F. 696 [C. C. A. 1]), though none of these decisions are in point upon the facts. It has much changed the common law, even if the equivocal decision of Cox v. Hickman, 8 H. L. C. 267, be accepted as controlling in this country. While it still remains true under section eleven (Laws 1919, c. 408) that profit sharing is prima facie evidence of the "association" defined in section ten, we are not to understand that it is ever more. The later subdivisions of that section deny to it any probative effect in the situations defined, but do not under any circumstances make profit-sharing ventures partnerships when it is otherwise apparent that the parties did not intend to "carry on as co-owners" any business whatever. The law has no doubt been brought into accord with business usage, yet there is not, as there should not be, any standard other than that the parties shall enter upon a joint business venture, vague as that is.

While the point is not argued, it is theoretically possible to debate whether the transaction was a transfer of one half Cohan's rights in Cohan & Harris and later in his own business, though it did not create a partnership. In any such aspect it must be remembered that the attempt was not to give her any direct interest in the firm of Cohan & Harris, or, if it was, it was ineffectual, because of Harris's failure to assent. Cohan could have given her no present right in such profits as he might thereafter withdraw, and there could not be an immediate gift, even if present words of gift had been used. Whether such a gift would have inured to the benefit of the donee as soon as Cohan withdrew any profits, and before he paid

them over, we need not say; the gift was revocable until then in any case, and the case falls within Mitchel v. Bowers, 15 F. (2d) 287 (C. C. A. 2), where the agreement contained an express power of revocation. Finally, the words were not those of present gift in any event, but at most only a promise to share with his mother as the profits came in, and this is equally true after the firm of Cohan & Harris was dissolved as before.

■ The next question is as to certain royalties upon a play produced in 1910, called "Get Rich Quick Wallingford." Cohan had written this in collaboration with his father who contributed the fourth act. As joint authors, each had a share in the resulting property (Maurel v. Smith, 271 F. 211 [C. C. A. 2]), and we may assume that in the absence of any contract they would share alike. Cohan agreed, however, while the work was in preparation, that his father was to have all the profits, and this we take at least as a gratuitous contribution of his services. The father thus became the owner of the play, and it passed to his representatives upon his death. Since the widow and the children shared alike, Cohan's part in the royalties was only one-third, with which at most his income could be charged. Whether that part passed to his mother depends again upon the effect of the transaction we have been discussing, but which we have hitherto found it unnecessary to decide. Being a right of literary property incapable of delivery, we know of no way by which a valid gift could be made save by deed. Beaver v. Beaver, 117 N. Y. 421, 429, 432, 22 N. E. 940, 6 L. R. A. 403, 15 Am. St. Rep. 531; In re Van Alstyne, 207 N. Y. 298, 100 N. E. 802. While therefore we think that the income should have been reduced by two-thirds of the royalties for 1918—the only year in question—Cohan must bear his third. The Board's finding is modified pro tanto.

The next question arises over the royalties for the years 1919 and 1920 which came to Cohan for some songs which he wrote for a play called "The Royal Vagabond." All that the findings say, is that he "agreed with his wife, Agnes M. Cohan, to give her the royalties from the sale of the songs." Quite aside from anything else, this does not show even an effort to make a present gift.

■ Cohan and Harris were joint lessees of a theatre in Chicago, and had assigned the lease to a little company whose shares they held half and half. After the dissolution of the firm in 1920, for a while they tried to appor-

tion their bookings by agreement, but this proved too troublesome, so that in November of that year they agreed that Cohan should have the entire rights in it, Harris to arrange elsewhere for his plays. He needed one hundred and fifty thousand dollars for this purpose, which Cohan lent him, but until August, 1922, they were to use the theatre in common, Harris' profits going to extinguish the loan which he did not personally promise to pay. In October, 1922, they made a second agreement by which Harris in final payment assigned his rights in the lease—though he had none—his shares in the company, and his interest in the security which the firm had put up with the lessor.

Cohan deducted the loan from his income in 1920 as an expense, and the Board refused to allow it. His theory is either that it was an expense of his business, or that it purchased certain wasting rights which should be annually amortized. Neither position is good in law. The loan was originally to be repaid out of Harris' earnings from the theatre, apparently on the supposition that these would discharge it within two years. We infer that they did not, else the second agreement would not have been necessary, under which the balance was discharged by the shares and the deposit. Neither the money received, nor the shares, were a wasting asset, unless possibly the shares; but as there is no evidence of any depreciation in the lease between the time of the assignment, October, 1922, and June thirtieth, 1923, the deduction cannot be computed.

■ In the production of his plays Cohan was obliged to be free-handed in entertaining actors, employees, and, as he naively adds, dramatic critics. He had also to travel much, at times with his attorney. These expenses amounted to substantial sums, but he kept no account and probably could not have done so. At the trial before the Board he estimated that he had spent eleven thousand dollars in this fashion during the first six months of 1921, twenty-two thousand dollars, between July first, 1921, and June thirtieth, 1922, and as much for his following fiscal year, fifty-five thousand dollars in all. The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible

and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent. True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses. The amount may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to refuse any, even though it were the traveling expenses of a single trip. It is not fatal that the result will inevitably be speculative; many important decisions must be such. We think that the Board was in error as to this and must reconsider the evidence.

There remain two questions relating to the computation of the income, each arising under the statute. Cohan had filed his returns for 1918 and 1919 upon the basis of the calendar year. In December, 1920, he asked leave to change to a fiscal year, from July first to June thirtieth, that being the usual one in theatrical businesses. It was too late under the regulations to get leave for the year 1920, but the Commissioner granted it for the next year, requiring him to file a return for the first six months of 1921, under section 212 (b) of that act (42 Stat. 237). This he did not do, but continued to file returns for the calendar years, ignoring the consent. The Board fixed his taxes on the basis of a fiscal year from July first to June thirtieth, beginning in 1921, and of a separate return for the six months between January first and June thirtieth, 1921. Upon the trial he swore a witness who had kept his books, but he did not introduce them, though the Board gave him ample opportunity; because of this failure the testimony was ruled out.

The ruling was plainly right, for, while it is customary to allow accountants and the like to prepare estimates drawn from documents in evidence, this can never be done without the originals themselves, and the argument shows some hardihood. Section 212 (b) required the return to be made "in accordance with the method of accounting regularly employed in keeping the books"; and in their absence it could not appear that the books were not kept on the basis of the fiscal year that he had been required to accept. Indeed we must assume that they were, because otherwise the statute would not have justified his demand in December, 1920. Had he chosen to dispute the admission so implied, his only course was to produce the books, and prove that he had in fact continued to keep them on the "basis" of the calendar year.

The final question arises over the reassessment of the tax for the first six months of 1921. The Revenue Act of 1921 (42 Stat. 227) became a law on November twenty-third of that year, eleven months after Cohan had asked for leave to change his accounting period. Title 2 (the income tax) of the Act of 1918 (40 Stat. 1057) was repealed as of January first, 1921, the date on which the same title of the act of 1921 took effect (section 263). Section 226 (c) of 1921 substituted a new method of computing the tax for a part of the year when the taxpayer changed his accounting period under section 226 (a). Subdivisions (a) and (b) of that section were the same as the corresponding provisions of the Act of 1918 (40 Stat. 1075), but under these it was possible to file a return for a portion of the year as for the whole, thus escaping the heavy surtaxes upon a part of the income for the year in which the change was made. To correct this, subdivision (c) provided in substance that the part should be taken as a proportionate sample of a supposititious income for the whole year, that the tax should be assessed upon the sum so found, but that the taxpayer should pay only that fraction of it which the period of the partial return bore to the whole year.

This was obviously more onerous than what had gone before, and especially so in the case of any receipts which chanced to fall in the fractional period, and which were not recurrent during the remainder. For example, a man who wished to begin his fiscal year in February might make a large profit in January which was not repeated again; yet subdivision (c) required him to compute his tax as though he had got twelve such payments, one in every month, and, although he need pay only a twelfth of the total tax so found, he suffered severely in what he did pay. This is an extreme case and Cohan's period was only a half year, yet in that time he got several annual payments which did not recur in the second half of the year. This is his complaint.

The statute is explicit, and, if it applies and is valid, he must bear the exaction, for we cannot recast the law by apportioning the unique receipts ratably over a whole year. Had he chosen to change his books after the law was passed, nobody could doubt its ap-

plicability, but, as we have said, he got permission, and, as the proof stands, committed himself before January 1, 1921, the beginning of the period when by retroaction the Act of 1921 took effect, so that his tax is computed at a much higher rate than any which he could have anticipated. He argues that the statute was not retroactive as to section 326 (c), and that, if it was, it was unconstitutional. At the outset we must remember that the question merely concerns the method of computation; the statute reaches nothing that it did not reach before; incomes had been taxed for eight years quite as completely as under the Act of 1921. Furthermore, the change was to correct an omission in the Act of 1918, which allowed taxpayers to escape the high surtaxes imposed as a consequence of the Great War.

■■■ Before the decision of Brushaber v. Union Pacific R. R., 240 U. S. 1, 24, 25, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713, it had been supposed that the Fifth Amendment did not apply to taxing statutes at all, but the intimations in that case have since been followed by several decisions directly holding the contrary (Nichols v. Coolidge, 274 U. S. 531, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Blodgett v. Holden, 275 U. S. 142, 48 S. Ct. 105, 72 L. Ed. 206; Untermyer v. Anderson, 276 U. S. 440, 48 S. Ct. 353, 72 L. Ed. 645), and it must now be considered that in extreme cases transactions, untaxed when they took place, cannot be reached by a later statute, certainly when not in contemplation at the time. It is true that Brushaber v. Union Pacific R. R. concerned the income tax, but the suggestion there made has as yet borne no fruit in such cases. It appears to us that there is a valid distinction between the taxation of incomes and of gifts or testamentary transfers (Lewellyn v. Frick, 268 U. S. 238, 45 S. Ct. 487, 69 L. Ed. 934; Shwab v. Doyle, 258 U. S. 529, 42 S. Ct. 391, 66 L. Ed. 747, 26 A. L. R. 1454). Nobody has a vested right in the rate of taxation, which may be retroactively changed at the will of Congress at least for periods of less than twelve months; Congress has done so from the outset. Brushaber v. Union Pac. R. R. Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Lynch v. Hornby, 247 U. S. 339, 38 S. Ct. 543, 62 L. Ed. 1149. The same rule applies to excises (Billings v. U. S., 232 U. S. 261, 34 S. Ct. 421, 58 L. Ed. 596), even when imposed for the first time. There was here an evil to correct. Before the change, tax-

payers had had the opportunity to escape a common burden, which the section ended by adopting a fair rule, taken by and large. True, a portion of a year is often not a fair sample of the whole, but it will work now for, and now against, the individual, as often one way as the other. It is notoriously impossible nicely to adjust the weight of taxes, and it is no objection that upon occasion the result may disappoint reasonable anticipations. The injustice is no greater than if a man chance to make a profitable sale in the months before the general rates are retroactively changed. Such a one may indeed complain that, could he have foreseen the increase, he would have kept the transaction unliquidated, but it will not avail him; he must be prepared for such possibilities, the system being already in operation. His is a different case from that of one who, when he takes action, has no reason to suppose that any transactions of the sort will be taxed at all.

No doubt the difference is one of degree, but constitutional matters are generally that; limitations like the Fifth Amendment are not like sailing rules, or traffic ordinances; they do not circumscribe the action of Congress by metes and bounds. Rather they are admonitions of fair dealing, whose disregard the courts will correct, if extreme and glaring. Custom counts for much in such matters, and consistency for little; men cannot hope to fit their doings in advance to a pattern which will be sure to endure. The most they can expect is that courts will intervene when the defeat of their expectations passes any measure that reasonable persons could think tolerable, and even then their grievance must be fairly outside the zone of possible debate.

So it does not seem to us that the situation here calls for so heroic a remedy as to declare the statute unconstitutional, nor indeed for the lesser one of wringing the words out of their natural meaning. Nobody can really think that section 263 in making title 2 of the Act of 1921 date as of January first of that year, excepted subdivision (c) of section 226. In most cases it would operate fairly enough; we could excise only those in which it did not, and that we certainly cannot do. In those cases like Shwab v. Doyle and Lewellyn v. Frick, the statute was not explicit as here, and, while colloquial language is a fumbling means of expression, there are limits to its elasticity; to deny the application of these words to the case at bar seems to us to pass the point of rupture.

‡Cooper v. U. S., 280 U. S. 409, 50 S. Ct. 164, 74 L. Ed. ——.

The decision is modified as to the royalties of "Get Rich Quick Wallingford," and the cause is remanded to make some allowance for the expenses of travel and the like; otherwise it is affirmed.