BUDDY SCHOELLKOPF PRODUCTS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8117-73.    Filed December 31, 1975.

*William E. Collins,* for the petitioner.
*Charles L. McReynolds,* for the respondent.

642

OPINION

The first issue is whether the Commissioner erred in disallowing $4,000 of travel expenses claimed by petitioner. In order

to successfully deduct its travel expenses under Code section 162,[1] petitioner must substantiate these expenditures pursuant to the rules set forth in section 274(d). Section 274(d) provides that no deduction shall be taken for travel, entertainment, or gift expenses unless by either "adequate records" or "sufficient evidence corroborating his own statement" the taxpayer substantiates the essential elements relating to the nature and business character of the expenditure.[2] Among the specific showings required by the statute are the amount of the expense, the time and place of the travel, and the business purpose of the expenditure.

The substantiation requirements are clarified and explained in detail by the regulations.[3] The Treasury regulations under section 274 state that to meet the "adequate records" requirements the taxpayer must maintain "an account book, diary, statement of expense or similar record * * * and documentary evidence * * * which, in combination, are sufficient to establish each element of an expenditure" specified in the statute and regulations.[4]

Petitioner concedes that the adequate records requirement is not met here. Petitioner argues, however, that it has met the alternative standard of substantiation; viz., sufficient evidence corroborating petitioner's own statement. In addition to the testimony of petitioner's president, Hugo N. Schoellkopf, Jr., petitioner cites similar travel expenses which were substantiated and allowed by the respondent for periods both before and after

---

[1] All references are to the Internal Revenue Code of 1954 unless otherwise indicated.

[2] SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

(d) SUBSTANTIATION REQUIRED.—No deduction shall be allowed—

(1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),

(2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity, or

(3) for any expense for gifts,

unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. * * *

[3] Sec. 1.274-5, Income Tax Regs. The validity of the substantiation regulations was upheld by this Court in *William F. Sanford,* 50 T.C. 823 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969), cert. denied 396 U.S. 841 (1969).

[4] Sec. 1.274-5(c)(2)(i), Income Tax Regs.

the time frame in question. Unfortunately for petitioner, the existence of these allowed expenditures, without more, is not enough to satisfy the other "sufficient evidence" requirement. In discussing other "sufficient evidence" the regulations provide that if the taxpayer is unable to meet the "adequate records" requirement, then he must establish each element[5] of the expenditure:

(i) By his own statement, whether written or oral, containing specific information in detail as to such element; and

(ii) By other corroborative evidence sufficient to establish such element.[6]

The regulations go on to state that the taxpayer lacking adequate records must corroborate his own testimony with respect to the amount, time, and place of an expenditure by direct evidence obtained from one other than the taxpayer. The business purpose of an expenditure may be established by circumstantial evidence.

The regulations thus envision *specific* evidence about the activities that gave rise to an expense.[7] The record here is devoid of such specifics. In fact, no evidence of any particular individual travel expense appears in the record.

Not only did petitioner's corroborating evidence fail to shed any light on specific expenses incurred within the contested period, even the testimony of Buddy was only of a general nature. Under these circumstances, we must disallow any deductions for travel expenses for the period December 11, 1967, through June 17, 1968.

The existence of allowable travel expenses for the periods prior to and subsequent to the period under examination here, may

---

[5] Sec. 1.274-5. Substantiation requirements.

(b) *Elements of an expenditure—*
* * *

(2) *Travel.* The elements to be proved with respect to an expenditure for travel are—

(i) *Amount.* Amount of each separate expenditure for traveling away from home, such as cost of transportation or lodging, except that the daily cost of the traveler's own breakfast, lunch, and dinner and of expenditures incidental to such travel may be aggregated, if set forth in reasonable categories, such as for meals, for gasoline and oil, and for taxi fares;

(ii) *Time.* Dates of departure and return for each trip away from home, and number of days away from home spent on business;

(iii) *Place.* Destinations or locality of travel, described by name of city or town or other similar designation; and

(iv) *Business purpose.* Business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel.

[6] Sec. 1.274-5(c)(3), Income Tax Regs.

[7] See also *Hughes v. Commissioner,* 451 F.2d 975, 979 (2d Cir. 1971), affg. a Memorandum Opinion of this Court: "the corroborative evidence must nevertheless establish each statutory element—amount, time, place and purpose—of the expenditure with precision and particularity."

admittedly suggest that some legitimate travel expenses were incurred during this period. Nevertheless, we must disallow petitioner's claimed travel expenses *in full.* Section 274 was specifically designed to overturn, in this area, the rule in *Cohan v. Commissioner,* 39 F. 2d 540 (2d Cir. 1930), which permitted a court to make as close an approximation of the amount of the expenditures as it could, and allow the deductions therefor pro tanto.[8] Since petitioner was unable to substantiate its travel expenses, either by adequate records or by other sufficient evidence, corroborating its own statement, and we are not at liberty to estimate what those expenses might have been, respondent's determination must be sustained.

## Issue 2. Attorney Fees on Acquisition

### FINDINGS OF FACT

During the 1968 fiscal year, petitioner paid attorney fees in the amount of $4,500 in connection with the acquisition from Brunswick Corp. of certain assets related to the Red Head line of products.

At one time Red Head was a highly successful family-operated company engaged in much the same business as petitioner—the sale of certain products for the outdoor sportsman. The company was well established and the Red Head brand enjoyed a fine reputation in its field. In the early 1960's Red Head was bought out by Brunswick Corp. During the next 7 years, the company was not operated at a profit, and Red Head's status in the market diminished considerably.

By an agreement of sale and purchase dated August 30, 1968, petitioner acquired from Brunswick assets related to the Red Head line of products. The total purchase price of all assets acquired from Brunswick by petitioner was computed and allocated pursuant to the agreement as follows:

---

[8] The committee reports made this intention quite clear:

"This provision is intended to overrule, with respect to such expenses the so-called *Cohan* rule. In the case of *Cohan* v. *Commissioner,* 39 F. 2d 540 (C.A.2d, 1930), it was held that where the evidence indicated that a taxpayer had incurred deductible expenses but their exact amount could not be determined, the court must make 'as close an approximation as it can' rather than disallow the deduction entirely. Under your committee's bill, the entertainment, etc., expenses in such a case would be disallowed entirely."

H. Rept. No. 1447, 87th Cong., 2d Sess. 23 (1962), 1962-3 C.B. 405, 427. The same language is contained in S. Rept. No. 1881, 87th Cong., 2d Sess. 35 (1962), 1962-3 C.B. 707, 741.

| | |
|---|---|
| Inventory of raw materials | $490,479.85 |
| Inventory of finished goods | 1,788,588.32 |
| Equipment | 45,594.05 |
| Total | 2,394,932.22 |

Petitioner paid Brunswick the "standard cost" for the finished goods and raw material and the depreciated book value of machinery and equipment. There were no goods in process. In addition, petitioner received the trademarks and trade names of Red Head, Drybak, and Blue Bill. No part of the purchase price was allocated to these trade names in the sales agreement. The names "Drybak" and "Blue Bill" were never used by petitioner.

Customer dissatisfaction with Red Head's merchandise and service during recent years had substantially diminished Red Head's reputation. Nevertheless, petitioner did successfully utilize the Red Head trade name. Petitioner retained the Red Head sales organization with some modifications, and kept this line as a separate entity. This gave petitioner an additional marketing advantage because petitioner could sell both his own brand and the Red Head brand in the same area. This additional marketing opportunity was recognized by petitioner prior to the acquisition, and in part provided the incentive for the purchase.

Red Head Brand Corp. was incorporated as a wholly owned subsidiary of petitioner on September 5, 1968. On September 26, 1968, petitioner transferred as a capital contribution to Red Head Brand Corp. all of its interest in trademarks or trade names which had been acquired from Brunswick Corp. This subsidiary did not manufacture goods but was utilized solely as a sales outlet for products manufactured by petitioner. These products were marketed through Red Head Corp. under trade names used solely by that corporation.

## OPINION

Respondent argues that the $4,500 in legal fees incurred in connection with the acquisition of assets from Brunswick is attributable to goodwill or trademarks and therefore should be capitalized. See *Woodward v. Commissioner,* 397 U.S. 572 (1970). Respondent has stipulated that in the event these legal fees are not allocable to nonamortizable capital assets, then those expenditures will be allowed as a current business deduction.

It is clear at the outset that this Court is not bound by the allocation of values made in a purchase contract. *Copperhead Coal Co. v. Commissioner,* 272 F.2d 45 (6th Cir. 1959); *Sidney V. LeVine,* 24 T.C. 147 (1955). At the same time we note that the tax treatment of ancillary expenses in the acquisition of property, such as legal expenses, must be determined by reference to the character of the assets acquired. See *Woodward v. Commissioner, supra; George Eisler,* 59 T.C. 634 (1973). Thus, to the extent that we find the purchase price represented payment for trade names or goodwill, we will allocate a proportionate share of petitioner's legal fees to the acquisition of intangibles and capitalize the fees accordingly.[9]

Our task, therefore, is to examine the record and determine as best we can how much of the purchase price, if any, was properly attributable to goodwill and trade names. In order to sustain respondent's position that the entire $4,500 should be capitalized we would have to conclude that the full $2,394,932.22 purchase price was tendered solely for these intangibles. This we cannot do. The evidence indicates that petitioner received a great deal of valuable merchandise in the purchase from Brunswick. The purchase price for the inventory was not inflated and indeed was based primarily on the cost to the seller.

We are also inclined to agree with petitioner that Red Head had lost much of its fine reputation of years past. Nevertheless, we recognize that although the sale agreement did not specifically allocate part of the purchase price to the trade names, the use of the Red Head label and sales organization also represented a valuable part of what was transferred in the sale. This is made most clear by the testimony of Buddy Schoellkopf:

Here we've got an opportunity to acquire two million dollars worth of merchandise. * * * And, we have an opportunity to go into an entirely different marketing circumstance, with their salesmen, and to ease it into a circumstance that would be competitive to ours, but not competitive to ours. *We wanted another brand, we wanted another name,* so that we can sell neighbors, so that— and keep them happy—so we can sell a Black Sheep customer and a Red Head customer across the street, and both of them be happy. Where as it was now, we'd sell the Black Sheep customer and we'd go across the street and he'd say, "No, I don't want any of that Black Sheep, because the guy across the street's got it. I want something different". So he would buy from a competitor. [Emphasis added.]

---

[9] Respondent has apparently not attempted to capitalize any of the purchase price itself.

After a careful examination of this and other factors appearing in the record, we conclude that 10 percent of the purchase price was properly attributable to goodwill and trade names. *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930). Accordingly, we find that 10 percent of the attorney fees were ancillary to the acquisition of these intangibles and should be capitalized.

On that basis, we hold that of the $4,500 incurred for legal fees, $4,050 is deductible in the year of sale and $450 must be capitalized.

## *Issue 3. Loan Expenses*

### FINDINGS OF FACT

In the taxable year ended November 30, 1968, petitioner incurred costs totaling $5,168.51 in obtaining a $900,000 loan (hereafter referred to as first loan) from Prudential Insurance Co. of America (Prudential). This loan was evidenced by a promissory note dated January 5, 1968, bearing interest at a rate of 7 percent per annum with a due date of January 1, 1983. During 1968 petitioner entered into negotiations with Brunswick for the acquisition of certain assets related to the Red Head line of products. Under the terms of the agreement between Brunswick and petitioner, petitioner was obligated to secure a loan of additional funds.

On October 1, 1968, petitioner entered into a second loan agreement with Prudential. Pursuant to this agreement petitioner borrowed from Prudential the sum of $1,700,000 (hereafter referred to as second loan) evidenced by a promissory note in that amount bearing interest at the rate of 7.8 percent with a due date of March 1, 1984. The October 1, 1968, loan agreement also provided that the $900,000 note would be paid out of the proceeds of the $1,700,000 loan. The agreement further provided that Prudential would deliver to petitioner a check for $1,700,000 less the $900,000 representing the promissory note which would be canceled and accrued interest thereon, to the date of closing. Accordingly, the $900,000 note was canceled by Prudential on December 10, 1968.

### OPINION

The question presented by these facts is whether petitioner was entitled to deduct expenses of $5,168.51 incurred in obtaining

the first loan in the year that loan was canceled. Respondent argues that these expenses must be amortized over the 15-year period of the first loan.

It is well settled that expenses incurred in connection with securing a loan must be amortized and deducted over the life of the loan. *Julia Stow Lovejoy,* 18 B.T.A. 1179 (1930); *Anover Realty Corp.,* 33 T.C. 671 (1960). This Court has long recognized, however, that when the loan has been repaid prior to maturity, the unamortized expenses may be fully deducted in the year of repayment. *S. & L. Building Corp.,* 19 B.T.A. 788 (1930), revd. on other grounds, 60 F.2d 719 (2d Cir. 1932), revd. 288 U.S. 406 (1933); *Longview Hilton Hotel Co.,* 9 T.C. 180 (1947); *Anover Realty Corp., supra.*

Respondent accepts these principles but contends that there was no repayment of the $900,000 note but only an $800,000 increase in the same loan. If the second loan was in substance merely an increase of indebtedness pursuant to the first loan, then we agree that the expenses incurred in obtaining the initial outlay must continue to be amortized. The critical factual inquiry, therefore, is whether the two loan transactions were sufficiently distinct to consider the cancellation of the first note a repayment.

While we acknowledge that this is a close question, we find that the second loan was separate and independent from the first loan and that the first loan could properly be characterized as repaid. This was not simply a refinancing operation, but arose from petitioner's need for new funds to purchase assets from Brunswick Corp. This required a second loan whose terms were separately and newly bargained for. As a result of this new bargaining there was a change in both the interest rate (7 percent in the first loan, 7.8 percent in the second loan[10]) and the maturity date.

If the first loan were paid out of funds borrowed from another lender, the deductibility of these unamortized expenditures

---

[10] Respondent argues that the interest rate of the second loan really amounts to an average of 7 percent on the first $900,000 and 8.75 percent on the additional $800,000. This bootstrap operation by respondent is pure conjecture. Respondent has apparently simply performed the calculations based on the assumption of a consolidated loan and an average interest rate; having two knowns (the 7-percent and the 7.8-percent rate) he has calculated the unknown quantity associated with his assumption and arrived at an 8.75-percent interest rate. The subtle aura of certitude associated with quantitative conclusions cannot hide the respondent's failure to introduce one shred of evidence that interest rates in fact increased by 1.75 percentage points in such a time.

would be unquestionable. Where the first loan is paid out of the proceeds of a second *independent* loan from the same lender we believe the result should be no different. The taxpayer should not be penalized when, for business reasons, he places another loan with the same lender. Petitioner acknowledges that it must amortize the new expenses incurred in obtaining the second loan.[11]

We also note that the discharge of the first loan occurred in the ordinary course of business, as a consequence of the purchase from Brunswick. In fact, *both* loan agreements contain provisions for the discharge of certain outstanding debts of the borrower.

It may well be that petitioner could have added new indebtedness to the first loan and modified the terms of that loan. But it is clear from the bargained-for results that a change in the maturity date and in the interest rate—as well as the principal amount— would have been required. It would then have been arguable that the amended first note was in substance a new note. This format was, of course, not followed, but it is useful in illustrating the substance of the transaction regardless of how it was packaged.

Finally, respondent argues that the expenses at issue cannot be deducted because there has been no shifting of the burden for repayment of the loan. Respondent relies on cases in which, for example, the loan is secured by a mortgage which is taken over by a purchaser or otherwise assumed by a third party. See *S. & L. Building Corp., supra; Longview Hilton Hotel Co., supra.* Respondent's argument is misplaced, however, since a shifting of the burden of repayment is not required when the outstanding loan has been fully satisfied.

We therefore hold that petitioner is entitled to deduct the $5,168.51 incurred in connection with the first loan, in petitioner's taxable year ending November 30, 1969.

## Issue 4. Depreciation on Airplane

### FINDINGS OF FACT

On January 23, 1964, petitioner purchased a used Cessna 310-D airplane for $41,931.14. In depreciating the airplane, which had a salvage value of $10,000, petitioner originally used the 200-percent (double) declining balance method of depreciation.

---

[11] Petitioner incurred costs of $750 in the taxable year ended Nov. 30, 1968, and $1,500 in the taxable year ended Nov. 30, 1969, in connection with obtaining the $1,700,000 loan.

On November 30, 1967, the airplane had an estimated remaining life of 52 months and the depreciation reserve thereon was $25,607.38. Petitioner claimed deductions for depreciation on the airplane in the amount of $5,549.96 in each of the taxable years ended November 30, 1968, and November 1969, computed by the double declining balance method.

Both parties now agree that the use of the double declining balance method was improper. Respondent recomputed the depreciation for the years in issue (fiscal years 1968 and 1969) using straight line depreciation. Petitioner seeks to use the 150-percent declining balance method for those years.

OPINION

Section 167 allows as a depreciation deduction a reasonable amount for the exhaustion, wear, and tear of property used in a trade or business or held for the production of income.[12] This section further provides that the term "reasonable allowance" includes but is not limited to an allowance computed in accordance with prescribed regulations under any one of four enumerated methods. Among those methods are the declining balance method and the straight line method.[13] Section 167(c), however, restricts the use of certain declining balance method, to property, the original use of which commenced with the

---

[12] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income.

[13] SEC. 167. DEPRECIATION.

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

(1) the straight line method,

(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),

(3) the sum of the years-digits method, and

(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

taxpayer.[14] Since petitioner here is depreciating used property, it is clear that the double declining balance method is not available to it.

In disallowing depreciation deductions for the years in issue, respondent utilized the straight line method to recompute the allowable depreciation on petitioner's plane. While petitioner concedes that its use of the double declining balance method was improper, petitioner claims it is still entitled to depreciate the plane on the basis of the 150-percent declining balance method of depreciation,[15] which respondent's regulations make available in the case of used property. The issue, therefore, is whether petitioner may now elect the 150-percent declining balance method or whether it is restricted to the use of the straight line method in computing its depreciation.

Respondent contends that petitioner's change in computing depreciation from double declining balance to 150-percent declining balance represents a change of accounting method under section 446(e) requiring the prior consent of the Commissioner. Since such consent has neither been sought nor given, respondent argues, petitioner cannot freely elect the 150-percent declining balance method.[16]

---

[14] SEC. 167. DEPRECIATION.

(c) LIMITATIONS ON USE OF CERTAIN METHODS AND RATES.—Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more—
* * *

(2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date.

[15] The statutory basis for the use of the 150-percent declining balance method is the authorization given in sec. 167(a) for a "reasonable allowance" for depreciation. This method is independent of those specifically authorized in sec. 167(b). The characterization of the 150-percent declining balance method as one likely to produce a reasonable allowance under sec. 167(a) is supported by the regulations:

Sec. 1.167(b)-0. Methods of computing depreciation.

(a) *In general.* * * *

(b) *Certain methods.* Methods previously found adequate to produce a reasonable allowance under the Internal Revenue Code of 1939 or prior revenue laws will, if used consistently by the taxpayer, continue to be acceptable under section 167(a). Examples of such methods which continue to be acceptable are the straight line method, the declining balance method with the rate limited to 150 percent of the applicable straight line rate
* * *

See *Robert M. Foley,* 56 T.C. 765 (1971).

The use of the 150-percent declining balance method may not always produce a reasonable allowance under section 167(a). *Computing & Software, Inc.,* 64 T.C. 223 (1975). Respondent has not raised the issue of whether the 150 percent declining balance method yields a reasonable allowance here.

[16] Sec. 446(e) states that "a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his

We disagree. This case is similar in many respects to *Silver Queen Motel,* 55 T.C. 1101 (1971), acq. 1972-2 C.B. 3 (see also Rev. Rul. 72-491, 1972-2 C.B. 104), which also involved the erroneous election of the 200-percent declining balance method for used property. In *Silver Queen Motel,* the respondent challenged this error beginning with the first year the property in question was subject to depreciation, and sought to limit the taxpayer to straight line depreciation. We nevertheless held that the taxpayer was entitled to use the 150-percent declining balance method, noting that:

if respondent's contention were to prevail, a taxpayer attempting initially to elect the accelerated depreciation methods of section 167(b) would be put to an "all or nothing" decision the dampening effect of which upon the taxpayer's choice would significantly detract from the liberalizing influence which was obviously intended by the enactment of sections 167(b) and 167(c).

We believe the reasoning of *Silver Queen Motel* is applicable to the instant case. As in *Silver Queen,* respondent does not here suggest that the 150-percent declining balance method would fail to produce a reasonable allowance over the remaining useful life or that the initial error was not made in good faith; indeed, there is every reason to believe (and respondent in no way suggests the contrary) that petitioner would be permitted to select the 150-percent declining balance method but for his prior error. There is only one difference between the two cases: in *Silver Queen Motel* the error could be corrected beginning with the first year the property was placed in service; in the case before us the statute of limitations apparently precludes correcting the error during the

taxable income under the new method, secure the consent of the Secretary or his delegate."

The regulations under sec. 167 state that "Any change in a *method* of computing the depreciation allowances with respect to a particular account * * * is a change in method of accounting" (emphasis added) requiring prior consent under sec. 446. See sec. 1.167(e)-1(a), Income Tax Regs. Sec. 167(b)(2) states that depreciation may be computed under "the declining balance *method,* using a rate not exceeding twice the [straight line] rate." (Emphasis added.) Regardless of the rate taken, "the declining balance *method"* appears to be one method distinct from other methods, such as the straight line method, or the sum of the digits method. Yet the regulations treat a change from a 200-percent to a 150-percent rate under the same declining balance *method* as a change in the method of computing depreciation and therefore a change of *accounting* method requiring prior *consent* under sec. 446(e), while nevertheless permitting a taxpayer to change from the 200-percent declining balance method to the straight line method without prior consent. Compare secs. 1.167(e)-1(b) and 1.167(e)-1(a), Income Tax Regs. Compare also S. Rept. No. 1622, 83d Cong., 2d Sess. 200 and 201 with 300 (1954). We need not deal with these apparent inconsistencies in the regulations, since for the reasons noted we believe petitioner is entitled to use the 150-percent declining balance method even assuming it involves a change in accounting method.

first 3 years the property was utilized, and the error can only be corrected beginning with the fourth and subsequent years.

We do not believe that this is a sufficient reason for failing to apply the principle of *Silver Queen Motel.* Undoubtedly, depreciation was taken in years not before the Court at a rate not warranted by the statute, and these years are apparently beyond the statute of limitations. But this is no reason to compensate for excessive acceleration in the early years by excessive deceleration in the remaining years. The issue we face is the proper rate of depreciation allowable for the years before the Court, and we cannot resolve that issue by assuming that there is some quantitative correlation between the error in the closed year and the departure from normal practice in the other direction that respondent seeks to impose on petitioner in the years before the Court.

We note that our conclusion is completely consistent with the manner in which respondent prospectively adjusts the rate of depreciation resulting from changes in estimated useful life.[17]

### Issue 5. Amortization of Leasehold Improvements

#### FINDINGS OF FACT

In 1956 certain land in Mineola, Tex. was acquired equally by two trusts, one for the benefit of the children of Hugo W. Schoellkopf, Jr. (Schoellkopf trust), and one for the benefit of the children of Delbert W. Chandler (Chandler trust).[18] Hugo Schoellkopf, Jr., was the trustee for the Schoellkopf trust and Delbert Chandler was the trustee for the Chandler trust. The terms of the two trusts were nearly identical. Under the heading "Trustee's Powers and Duties" each instrument contained the following provision:

---

[17] Sec. 1.167(b)-2(c), Income Tax Regs., provides:

(c) *Change in estimated useful life.* In the declining balance method when a change is justified in the useful life estimated for an account, subsequent computations shall be made as though the revised useful life had been originally estimated. For example, assume that an account has an estimated useful life of ten years and that a declining balance rate of 20 percent is applicable. If, at the end of the sixth year, it is determined that the remaining useful life of the account is six years, computations shall be made as though the estimated useful life was originally determined as twelve years. Accordingly, the applicable depreciation rate will be 16⅔ percent. This rate is thereafter applied to the unrecovered cost or other basis.

[18] The Schoellkopf trust was established on Nov. 22, 1956. The Chandler trust was also set up in 1956, but the exact day and month are not in evidence. The record suggests, however, that the two trusts were established on the same day.

(b) The trustee shall have full power to sell, convey, exchange, lease for a term of years ending prior to or after the termination of this trust, mortgage, pledge, partition, distribute or otherwise dispose of any or all of said trust estate and properties or any part thereof at such time and in such manner as the trustee shall deem advisable. The trustee is given specific authority to purchase real estate, improved or unimproved, and to execute leases with respect to any property so acquired. * * *

Pursuant to the power to execute leases, the trustees, on November 30, 1956, leased their recently acquired land to the Mineola Industrial Foundation.[19] The term of the lease was for a period of 15 years beginning with the completion of a factory building to be erected by the foundation. The foundation, in turn, leased the land to petitioner for the same period.[20] The lease running to petitioner was also executed on November 30, 1956. Neither lease contains a renewal option.

The building on the leased land was constructed during 1956 and 1957 at the foundation's expense, and was built to the specifications of petitioner. The foundation also made subsequent additions to the building. By the terms of the leases all improvements constructed on the leased premises became the property of the Schoellkopf and Chandler trusts. The buildings have a longer useful life than the initial lease term.

In 1965, petitioner expended the sum of $82,154.45 for improvements on the leased premises. The principal items of improvement were the air conditioning of manufacturing space at a cost of $35,000 and a fire sprinkler system at a cost of $45,000. In petitioner's judgment, the installation of air conditioning was required to maintain petitioner's work force. Installation of the sprinkler system was required to retain insurance coverage.

On its book and records, petitioner amortized all improvements over the remaining term of the lease, i.e., from the date of acquisition until April 1972, when the lease term was due to

---

[19] Although the record contains no evidence as to the nature of the Mineola Industrial Foundation and its leadership, the parties have stipulated that neither petitioner nor any of its officers or directors have ever owned any interest in or been an officer, director, or employee of this organization.

[20] The lease between the trusts and the foundation calls for a total rental of $3,000 payable at the rate of $200 *per year* at the end of each 12-month period. For the same term, the lease between the foundation and petitioner, called for a total payment of $99,000 payable at the rate of $550 *per month* in advance. The foundation was to erect a factory building on the leased premises at its own cost. During 1968 and 1969, petitioner's fixed net rental under the lease was $2,705 per month.

expire. Accordingly, petitioner took the amounts resulting from such amortization as deductions on its income tax returns. Respondent has disallowed these amortization deductions, and has sought to have petitioner depreciate the improvements over their useful lives. The useful life of the air conditioning in the Mineola plant is 10 years and the useful life of the fire sprinkler system in that plant is 25 years.

## OPINION

The issue presented for our decision is whether the cost of improvements made by petitioner should be amortized over the remaining lease term, as petitioner contends, or over the useful lives of the improvements as contended by the respondent.

It is well established that where the tenancy of the lease is for an indefinite period of time, the lessee must depreciate the cost of improvements over their useful lives. *James L. Stinnett, Jr.,* 54 T.C. 221 (1970); *Kerr-Cochran, Inc.,* 30 T.C. 69 (1958); *Standard Tube Co.,* 6 T.C. 950 (1946). Conversely, where the lease term is for a definite period, improvements are generally amortizable over the useful life of the improvement or the remaining period of the lease, whichever is shorter. Sec. 1.162-11(b), Income Tax Regs. Whether the lease term is of definite or indefinite duration is a question of fact to be gleaned not only from the lease itself but also from the surrounding facts and circumstances. *James L. Stinnett, supra; G. W. Van Keppel Co. v. Commissioner,* 295 F.2d 767 (8th Cir. 1961). We have concluded on the basis of the facts before us that petitioner's lease of the Mineola property was of indefinite duration and therefore petitioner's improvements thereon should be depreciated over their useful lives.

The lease between the two trusts and the Mineola Industrial Foundation provided that any improvement placed on the property at the expense of the lessee would become the property of the trusts at the termination of the lease. Thus, as trustees of the trusts, Hugo Schoellkopf, Jr., and Delbert Chandler (also sole shareholders of petitioner) effectively controlled any action that might be taken by the foundation. Given the fact that the terms of the two leases were concurrent, if the foundation chose not to renew its lease with petitioner, the trustees could likewise decline to renew its lease with the foundation. Under such circumstances, the trusts could lease directly to petitioner giving petitioner un-

interrupted enjoyment of the leased premises. In short, petitioner could continue to occupy the leased property for as long as its two shareholders considered it advantageous to do so. This kind of flexibility is characteristic of an indefinite lease. *Highland Hills Swimming Club, Inc. v. Wiseman,* 272 F.2d 176 (10th Cir. 1959).

We are aware that the period provided for in the lease was of a fixed term, but we must also account for the economic realities surrounding the leasing transaction. It is a fundamental principle of tax law that form must give way to substance. *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945). In the application of this principle it is clear that lease terms may be disregarded. *Highland Hills Swimming Club, Inc., supra,* and the cases cited therein.

Other factors appearing in the record also suggest petitioner will continue to occupy the subject property beyond the stated lease term. We note that the initial building was constructed to the specifications of petitioner and that this building had a longer life than the original 15-year term. Another indication of intent to remain on the leased premises was the installation of expensive equipment, viz., the air conditioning and sprinkler system, which had substantially longer useful lives than the short period remaining in the lease.

Finally, we observe that the rule allowing a lessee to amortize improvements over a lease term shorter than the estimated life of the improvements contemplates an arm's-length situation in which the lessee will only have the use of those improvements during the shorter period. In such a situation, a rule which accounts for the more limited period of actual use by the lessee is appropriate. The facts here persuade us that these improvements will be utilized well beyond the expiration of the current lease term.

Petitioner contends we have a renewal situation here which should be governed by section 178. While section 178 is analogous and the factors entering into our decision are similar to those applied under section 178 in a renewal determination, we do not believe section 178 to be directly applicable. Since the facts here indicate that the lease term is of indefinite duration, it is unnecessary to consider the question of a renewal after the expiration of a fixed lease term. *G. W. Van Keppel Co. v.*

*Commissioner*, 295 F.2d at 770. In any event, had we decided the issue under section 178 the result would be the same.

We hold that petitioner must depreciate the cost of the improvements over their useful lives.

*Issue 6. Little Sandy Hunting and Fishing Club Dues*

FINDINGS OF FACT

In the taxable years ending November 30, 1968, and November 30, 1969, petitioner expended the amounts of $420 and $540, respectively for dues paid to Little Sandy Hunting and Fishing Club (Little Sandy) in Hawkins, Tex. The dues were paid by petitioner to maintain the individual membership of Hugo W. Schoellkopf, Jr.

Little Sandy is a private recreational facility consisting of a modest clubhouse and four lakes, and is used primarily for hunting and fishing. The club has rules which strictly limit the use of the facility by guests. Petitioner, therefore, did not use Little Sandy to entertain customers or suppliers.

Petitioner's president testified that membership in the club was maintained in order to have continued access to Little Sandy's facilities for the testing of its products. In addition, he stated that the comments and criticisms of Little Sandy's members on hunting and fishing equipment were helpful to petitioner's business.

OPINION

The issue raised by these facts is whether the dues paid to maintain Buddy's membership in Little Sandy are deductible by petitioner as an ordinary and necessary business expense under section 162. Since the parties have largely directed their attention toward the disallowance provisions of section 274, we will first determine the applicability of that section.

Under section 274 a deduction will be disallowed for expenses incurred with respect to an entertainment, amusement, or recreational facility unless the facility was used primarily in furtherance of the taxpayer's trade or business and the expenditure was directly related to the active conduct of such trade or business.[21] Facilities used in connection with entertainment

---

[21] SEC. 274. DISALLOWANCE OF CERTAIN ENTERTAINMENT, ETC., EXPENSES.

include yachts, country clubs, swimming pools, tennis courts, hunting lodges, and fishing camps. Sec. 1.274-2(e)(2)(i), Income Tax Regs. Dues paid to any social, athletic, or sporting clubs are considered expenditures with respect to an entertainment facility.

Petitioner argues that the dues paid to Little Sandy are not paid with respect to an entertainment facility since no guests of petitioner were entertained there. The regulations make it clear, however, that an expenditure may be for entertainment within the meaning of section 274, even though the expenditure relates solely to the taxpayer. The regulations specifically reject the notion that entertainment means only the entertainment of others. Sec. 1.274-2(b)(1)(ii), Income Tax Regs. We therefore conclude that Little Sandy constituted an entertainment facility.

Petitioner next contends that even if Little Sandy were generally considered to be an entertainment facility, it could not be regarded as such a facility with respect to petitioner since Buddy's activities there were business and not recreational in nature. The regulations establish an objective test in determining whether an activity will constitute entertainment for a particular taxpayer. In making this determination the taxpayer's trade or business shall be taken into account.

Thus, although attending a theatrical performance would generally be considered entertainment, it would not be so considered in the case of a professional

---

(a) ENTERTAINMENT, AMUSEMENT, OR RECREATION.—

(1) IN GENERAL.—No deduction otherwise allowable under this chapter shall be allowed for any item—

(A) ACTIVITY.—With respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, unless the taxpayer establishes that the item was directly related to, or, in the case of an item directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), that such item was associated with, the active conduct of the taxpayer's trade or business, or

(B) FACILITY.—With respect to a facility used in connection with an activity referred to in subparagraph (A), unless the taxpayer establishes that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business, and such deduction shall in no event exceed the portion of such item directly related to, or, in the case of an item described in subparagraph (A) directly preceding or following a substantial and bona fide business discussion (including business meetings at a convention or otherwise), the portion of such item associated with, the active conduct of the taxpayer's trade or business.

(2) SPECIAL RULES.—For purposes of applying paragraph (1)—

(A) Dues or fees to any social, athletic, or sporting club or organization shall be treated as items with respect to facilities.

(B) An activity described in section 212 shall be treated as a trade or business.

theater critic, attending in his professional capacity. Similarly, if a manufacturer of dresses conducts a fashion show to introduce his products to a group of store buyers, the show would not be generally considered to constitute entertainment. However, if an appliance distributor conducts a fashion show for the wives of his retailers, the fashion show would be generally considered to constitute entertainment. [Sec. 1.274-2(b)(1) (ii), Income Tax Regs.]

Based on the facts before us, we must conclude that the hunting and fishing facilities provided by Little Sandy did constitute entertainment to Buddy. As president of petitioner Buddy was not a professional hunter or fisherman, but a seller and manufacturer of sporting equipment. As such, Buddy's participation in Little Sandy's activities more closely resembled recreation than it did performance of professional duties. The record, moreover, makes it clear that these outdoor activities were an important part of Buddy's recreational life.

Despite our finding that Little Sandy was a recreational facility within the meaning of section 274, petitioner need not suffer disallowance of its dues expense if it can establish that the facility was used primarily in furtherance of petitioner's trade or business or that the expense was related to the active conduct of such trade or business. Sec. 274(a)(1)(B). In this vein petitioner argues that the primary function of Little Sandy was as a testing ground for petitioner's products. We have not been so persuaded.

Other than the relatively vague testimony of Buddy on this matter, petitioner has failed to present any evidence which would establish petitioner's use of Little Sandy as a testing site. No documents, records, or similar material have been produced by petitioner. In the absence of any such evidence, we cannot find that petitioner has carried his burden of proving the business nature of the facility.[22]

Finally, we do not believe that the incidental business benefit petitioner may have derived from the comments of club members on its products was sufficient to satisfy the business-use requirement of section 274 and the regulations thereunder.

While the substantiation requirements of section 274(d) are applicable to the present issue, we need not consider the more rigorous standards of section 274(d) since the sum of petitioner's

---

[22] The taxpayer can satisfy the statutory requirements of sec. 274 (a)(1)(B) by establishing that more than 50 percent of the *actual use* of the facility took place during days of business use. Sec. 1.274-2(e)(4), Income Tax Regs. Since there are no existing records to show the actual use of the facility, it must be presumed that the use of the facility was primarily personal. Sec. 1.274-5(c)(6), Income Tax Regs.

evidence falls short of establishing that the primary use of Little Sandy was for business purposes. *Ford S. Worthy, Jr.,* 62 T.C. 303 (1974). Moreover, since petitioner's deduction for Little Sandy dues must be disallowed under the terms of section 274(a)(1)(B), we do not reach the question of whether the dues paid by petitioner are ordinary and necessary business expenses under section 162.

## Issue 7. Alaskan Arctic Hunt

### FINDINGS OF FACT

In September 1969, Buddy and his son, Hugo, flew to Alaska in order to make an Arctic hunt. Their guide on this venture was Herman (Bud) Helmericks, a prominent Alaskan pioneer and guide. Bud and Buddy had known each other for almost 15 years and the Schoellkopf and Helmericks families were good friends. In fact, Hugo was the best man at the wedding of Bud's son, Jim.

The arrangements for the Alaskan hunting trip were handled principally through a series of letters between the Schoellkopf and Helmericks families. The letters were written at relatively frequent intervals and exhibited a strong personal tone. Great enthusiasm was expressed for the forthcoming hunt.[23]

A guide-client contract was signed by both parties to formalize the venture. The contract stated that the hunt would be for sheep, moose, caribou, bear, birds, and fish. Trophies were to be prepared and packed by the Helmericks. The price for the hunt as set in the agreement was $6,000.[24] The 3-week hunt into the remote regions of the Arctic was expensive largely because two planes were necessary to transport the hunters wherever they traveled. The total cost of the trip was $9,969 and this amount

---

[23] In addition to the hunting trip, two other reasons were expressed in the letters for Buddy's desire to go to Alaska at that time. The first of these was the expression by the Schoellkopfs that they were investigating the possibility of purchasing property at Walter Lake in the Arctic to use as a family resort or vacation area. The property contemplated for purchase was an outpost haven accessible only by air. The record indicates that the purchase was largely Bud's idea, prompted by his desire to have a neighbor in that isolated region. We have concluded that the purchase was never seriously considered and Buddy did not go to Walker Lake during the trip in order to look over the property.

Secondly, the letters frequently discussed a personal investment in a potential Alaskan oil field. Although Buddy and Hugo invested a total of $7,500 in this venture, there is no evidence to suggest that Buddy or his son spent any of their time in Alaska investigating the oil deal.

[24] Although Bud felt somewhat uneasy about taking the money, it was one of the few ways in which he earned a living. Besides hiring himself out as a guide and consultant, Bud supplemented his income by lecturing in the "lower 48" during the dark Arctic winter.

was claimed by petitioner as a deduction and disallowed in full by the respondent.

Buddy's stated objective in making the Alaskan hunting trip was his desire to test, under field conditions, cold weather hunting equipment. Petitioner attributes its success within the industry in large part to the participation by executive level personnel in the hunting and fishing activities for which petitioner's products are manufactured. Buddy testified that the Alaskan trip had taught him a number of things that would be useful to petitioner.[25] However, no detailed notes of facts and figures pertaining to the equipment were maintained with regard to the quality or quantity of performance of any specific equipment carried or utilized. Moreover, no diary or detailed memoranda of activity was kept on the trip.

Subsequent to the Alaskan trip, petitioner produced certain extremely cold weather items that had not been part of petitioner's product line prior to the trip. Examples of these items are down sleeping bags, certain types of down clothing, and down backpacks. The first of these new products was sold in late 1971. By fiscal 1973, the sale of these items totaled almost $2 million out of a total sales figure of $17 million.

## OPINION

The final issue presented for decision is whether petitioner's expenditures incurred in connection with the Arctic hunt are deductible under sections 162 and 274. Whether an expenditure is deductible as an ordinary and necessary business expense is chiefly a question of fact. *Commissioner v. Heininger,* 320 U.S. 467 (1943). The taxpayer has the burden of demonstrating that the purpose of the expenditure was primarily business rather than social or personal. *Vaughn V. Chapman,* 48 T.C. 358 (1967); *James Schulz,* 16 T.C. 401 (1951).

---

[25] Among the specific teachings of the trip, according to Buddy's testimony, were the following:

(1) Pockets should be especially large on an extreme cold weather coat because they must be large enough to accommodate a mitten with a gauntlet.

(2) To keep the hunter's hands warm, he should wear a knitted wristlet to protect a certain artery leading to the hand.

(3) In extremely cold weather, the down sleeping bags should be equipped with special head gear to protect the head.

(4) Metal snaps should not be put on extremely cold weather clothing because metal can carry such a low temperature that the metal may stick to the hunter's flesh if the snaps come in contact with the skin.

As previously noted, an expenditure otherwise allowable as an ordinary and necessary business expense under section 162, may nevertheless be disallowed under section 274. Section 274(a) provides in relevant part that no deduction shall be allowed for an entertainment activity "unless the taxpayer establishes that the item was directly related to * * * the active conduct of the taxpayer's trade or business." In detailing the elements of this requirement, the regulations provide that the principal character or aspect of combined business and entertainment activities must be the active conduct of the taxpayer's trade or business. Sec. 1.274-2(c)(3), Income Tax Regs. The regulations further provide as follows:

The active conduct of trade or business is considered not to be the principal character or aspect of combined business and entertainment activity on hunting or fishing trips or on yachts and other pleasure boats unless the taxpayer *clearly establishes* to the contrary. [Sec. 1.274-2(c)(3)(iii), Income Tax Regs. Emphasis added.]

Respondent has taken the position that the Arctic hunt expenses were personal expenses under section 262 and therefore not deductible as ordinary and necessary business expenses, and further, that the petitioner has failed to meet the requirements of section 274.

According to petitioner, the purpose of the trip was to test and research cold weather equipment. Yet, in the considerable correspondence arranging the trip there is virtually no mention of this objective. Furthermore, we have no records, notes, or other evidence that would show that any attention was given to testing and research during the hunt itself. In fact, all we have is the uncorroborated testimony of Buddy to the effect that the hunt was for business purposes. In the absence of anything more, we cannot say that petitioner has carried its burden of proof.

It is true that a few years after the hunt, petitioner began to market cold weather clothing. This factor, while weighing heavily in favor of petitioner, is not decisive. First, petitioner has not adduced any real evidence which establishes a link between the purposes of the Arctic hunt and the subsequent production of the cold weather line. We cannot base a deduction merely on the juxtaposition of these two events. Second, our focus is on the Arctic hunt itself. If the hunt was primarily personal, then no incidental business benefit can turn the hunt-related ex-

penditures into items directly related to the active conduct of a trade or business.

In sum, while the hunt may have been prompted by mixed business and personal motives, and might have produced some business benefit, we are nevertheless convinced on the evidence that the primary purpose of the trip was personal. Since petitioner's case falls short of the statutory requirements for deductibility under either section 162 or 274, we must sustain respondent's disallowance.

*Decision will be entered under Rule 155.*