T.C. Memo. 2020-65

UNITED STATES TAX COURT

GEORGE E. JOSEPH, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27759-15.                           Filed May 19, 2020.

R issued a notice of deficiency for P's 2011, 2012, and 2013 taxable years on the basis of substitutes for returns (SFRs) prepared under I.R.C. sec. 6020(b)(1). Thereafter, P filed or otherwise provided R with returns for those years in which he claimed deductions from partnerships and S corporations. The parties executed a stipulation of settled issues in which P agreed that he had recognizable capital gain and other income for the years in issue in excess of the amounts taken into account in the SFRs. R amended his answer to reflect those concessions. With few exceptions, R did not allow the deductions P claimed from his partnerships and S corporations. The documentation P submitted to substantiate those deductions consisted primarily of general ledgers and the bank statements from which they were prepared.

P argues that the parties' stipulation regarding his capital gain should be modified or set aside because of R's disallowance of depreciation that, he says, reduced the basis of the property whose sale gave rise to the gain.

[*2]        Held:  Justice requires modification of the parties' capital gain stipulation to eliminate a manifest double counting of income but does not require any adjustment of the stipulated capital gain to reflect R's disallowance of deductions for depreciation.  See Rule 91(e).

        Held, further, if the bank statements and general ledger establish a plausible, though not fully substantiated, connection between an expense reported by one of P's business entities and that entity's business, a portion of the expense is deductible under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

        Held, further, P is subject to self-employment tax on his income from one of the partnerships for 2012 and 2013 because he did not establish that the entity was a limited partnership of which he was a limited partner and thus did not demonstrate his entitlement to the exclusion provided in I.R.C. sec. 1402(a)(13).

        Held, further, R's determination of additions to tax under I.R.C. sec. 6651(a)(1) for failure to file timely returns is sustained.

Gregory W. Mitchell, for petitioner.

Vivian Bodey and Michael S. Navarro, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  Respondent determined a deficiency of $396,170 in petitioner's Federal income tax for his taxable year ended December 31, 2011, and additions to tax under sections 6651(a)(1) and 6654 of $89,138 and $7,843,

[*3] respectively.[1] Respondent also determined an addition to tax under section 6651(a)(2) for that year in an amount to be computed at a later date. The same notice of deficiency states respondent's determination of deficiencies for petitioner's 2012 and 2013 taxable years and additions to tax for each of those years under sections 6651(a)(1) and (2) and 6654. In a stipulation of settled issues, petitioner agreed that he had earned income for each of the years in issue in excess of the amounts respondent took into account in determining the deficiencies stated in the notice of deficiency. Accordingly, respondent amended his answer to assert increased deficiencies and additions to tax for 2012 and 2013. (Because the effect of the increased income for 2011 to which petitioner agreed in the stipulation of settled issues was offset by deductions and losses that respondent conceded in that stipulation, respondent did not assert in his amended answer increased deficiencies or additions to tax for that year.) In particular, respondent's amended answer asserts a deficiency of $366,389 for 2012 and additions to tax under sections 6651(a)(1) and (2) and 6554 of $82,438, $91,597, and $6,568, respectively. For 2013, the amended answer asserts a deficiency of

---

[1]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. We round all dollar amounts to the nearest dollar.

**[*4]** $623,290 and additions to tax under sections 6651(a)(1) and (2) and 6654 of $140,240, $149,590, and $11,191, respectively.  We must decide whether petitioner:  (1) is bound by stipulations of the amount of his capital gain for 2013; (2) adequately substantiated deductions shown on returns of partnerships and S corporations that he claims should reduce his income from those entities; (3) adequately substantiated itemized deductions and other losses and deductions shown on his own returns; (4) is subject to self-employment tax on his share of the income of Greenville Ave Surgical Partners, LP (GASP), for 2012 and 2013; and (5) is liable for additions to tax for the years in issue under section 6651(a)(1).

FINDINGS OF FACT

Petitioner's Business Entities

During the years in issue, petitioner owned a 100% interest in each of two entities that the parties agree were "S corporations" for Federal income tax purposes as a result of elections filed under section 1362(a).  Through one of those entities, Eye Surgery of Texas, P.A. (ESOT), petitioner conducted a general ophthalmology practice involving procedures covered by Medicare and other forms of third-party reimbursement, such as treatment for cataracts and glaucoma and the provision of corneal transplants.  During 2011 and part of 2012, petitioner

**[*5]** used the second entity, George Joseph MD, PA (GJ MD, PA), to perform refractive surgeries on behalf of the LASIK Vision Institute (LVI).

Petitioner also owned a 99% interest in Pemberly Partners, Ltd. (Pemberly). G.E. Joseph, LLC (GEJ, LLC), owned the remaining 1% interest in Pemberly. The parties agree that Pemberly and GEJ, LLC were both classified as partnerships for Federal income tax purposes. Petitioner owned a 99% interest in GEJ, LLC and ESOT owned the remaining 1%. Pemberly had been formed to manage real property in Plano, Texas, on which petitioner hoped to develop a surgical center.

Petitioner also owned a 99% interest in GASP. Greenville Ave GP, LLC (Greenville GP), owned the remaining 1% of GASP. The parties agree that GASP and Greenville GP were both classified as partnerships for Federal income tax purposes. Petitioner owned 99% of Greenville GP and ESOT owned the remaining 1%. GASP was originally intended to operate the surgical center planned for the Plano property. When those plans were not realized, petitioner moved his work on behalf of LVI from GJ MD, PA to GASP.

Throughout 2013, petitioner owned a 100% interest in North Texas Eye & Facial Spec, PLLC (NTEF), another entity that the parties agree was an S corporation. During that year, petitioner moved his general ophthalmology practice from ESOT to NTEF.

**[\*6]** <u>The Notice of Deficiency</u>

When respondent issued the notice of deficiency in July 2015, petitioner had not filed a personal Federal income tax return for any of the years in issue. Accordingly, respondent based the notice of deficiency on substitutes for returns prepared under section 6020(b)(1).[2] Respondent contends that he relied on analyses of petitioner's bank deposits to determine his taxable income. Among other things, the notice of deficiency determined that petitioner was liable for self-employment tax for each of the years in issue.

<u>The Petition</u>

The petition originally filed in this case did not assign error to any of the specific determinations reflected in the notice of deficiency. <u>Cf.</u> Rule 34(b)(4) (providing that a petition must contain "[c]lear and concise assignments of each and every error which the petitioner alleges to have been committed by the Commissioner in the determination of the deficiency"). Instead, the petition acknowledged petitioner's failure to have filed timely returns for the years in issue but claimed that he had recently done so and that the amounts reflected in those

---

[2]Sec. 6020(b)(1) directs the Secretary to make a return for a person who fails to do so, on the basis of "his own knowledge and from such information as he can obtain through testimony or otherwise."

[*7] returns, rather than those stated in the notice of deficiency, were the correct amounts.

Tax Reporting by Petitioner and His Business Entities

2011

ESOT

The Form 1120S, U.S. Income Tax Return for an S Corporation, that ESOT filed for 2011 reports ordinary business income of $170,273, equal to the excess of total income of $753,829 over total deductions of $583,556. The total income equals $847,727 of gross receipts reduced by returns and allowances of $11,155 and cost of goods sold of $82,743. The total deductions include rents of $150,000, depreciation of $7,124, and unidentified "Other deductions" of $265,602. An unsigned copy of ESOT's 2011 return included in the record provides a list of the other deductions, which includes amortization of $16,000,[3] auto/truck expense of $41,767, legal and professional fees of $33,076, meals and entertainment expenses of $4,133, and travel expenses of $25,563.

---

[3]Petitioner's accountant, James Daffron, testified at trial that the amortization shown on ESOT's returns was of goodwill resulting from petitioner's acquisition of ESOT from the practice's prior owner.

**[*8]**      Pemberly

The Form 1065, U.S. Return of Partnership Income, that Pemberly filed for 2011 includes a Form 8825, Rental Real Estate Income and Expenses of a Partnership or an S Corporation, for the Plano property. Pemberly's 2011 Form 8825 for the Plano property reports gross rents of $300,000 and total expenses of $342,380. The reported expenses include $11,419 for insurance, $4,000 of legal and professional fees, $1,200 for repairs, $19,639 for utilities, $265,334 of depreciation, $1,303 for supplies, $556 of bank charges, $6,000 of "HOA fees", $929 of miscellaneous fees, and $32,000 of "adequate protection" payments.

GASP

Respondent's records indicate that GASP did not file a Form 1065 for 2011 until August 2015. That return reports gross receipts of $1,062 and total deductions of $2,616. GASP's reported expenses for 2011 include $346 for repairs and maintenance, $614 of bank charges, $288 of dues and subscriptions, $844 for maintenance, $16 for meals and entertainment, $58 for office supplies, and $450 for telephone.

GJ MD, PA

The Form 1120S that GJ MD, PA filed for 2011 reported an ordinary business loss of $59,249, equal to the excess of total deductions of $307,839 over

[*9] gross receipts of $248,590. The reported total deductions include $152,037 of rents, $2,500 of depreciation, $18,531 of auto/truck expenses, $20,788 of meals and entertainment expenses, $21,136 of travel expenses, and $3,860 for professional development. Petitioner explained at trial that GJ MD, PA's professional development expenses included the cost of meals and tickets to professional football games.

### Petitioner

A copy of the transcript of petitioner's account for his 2011 taxable year dated August 2017 does not show the filing of a return for that year. The parties stipulated, however, a copy of petitioner's original Form 1040, U.S. Individual Income Tax Return, for 2011. That copy shows that the Internal Revenue Service (IRS) first received it in August 2015.

Petitioner's 2011 return reports, among other things, wages of $24,600, a capital loss carryover of $1,329, a loss of $50,954 from the sale of rental real estate on Loma Alta Drive in Frisco, Texas, supplemental income from Schedule E, Supplemental Income and Loss, of $11,331, and itemized deductions of $80,113. The Schedule E included with petitioner's 2011 return reports no gross rents from the Loma Alta property and a loss of $69,934. Petitioner's 2011 Schedule E also reports nonpassive income of $14,377 from Novamed Surgery

[*10] Center and $170,273 from ESOT, and nonpassive losses of $41,956 from Pemberly, $424 from GEJ, LLC, $1,538 from GASP, $16 from Greenville GP, $202 from Surgery Center of Northpoint, and $59,249 from GJ MD, PA.

### 2012

#### ESOT

The Form 1120S that ESOT filed for 2012 reports ordinary business income of $132,811, equal to the excess of total income of $661,253 over total deductions of $528,442. The total income equals $657,937 of gross receipts reduced by returns and allowances of $4,865 and increased by other income of $8,181. The total deductions include $150,000 of rent expense, depreciation of $3,760, and other deductions of $270,352. An unsigned copy of ESOT's return included in the record identifies $20 of the other income as being from Greenville GP, while leaving the remainder of the $8,161 of other income unidentified. The unsigned return also provides a list of the other deductions, which includes $18,535 of vehicle expenses, $19,091 of travel expenses, $16,000 of amortization, and $14,718 of meals and entertainment expenses.

#### Pemberly and GEJ, LLC

The document that the parties stipulated to be a copy of the original Form 1065 Pemberly filed for 2012 reports a net rental loss of $140,803 but does not

[*11] include a Form 8825. The record also includes a 2012 return for Pemberly stamped "Client Copy" that has no signature on behalf of the partnership. (The only signature on the return is that of Mr. Daffron, who signed as paid preparer.) The unsigned copy of Pemberly's 2012 return includes a Form 8825 for the Plano property that shows $150,000 of gross rents and $290,803 of total expenses, including $10,000 of legal and other professional fees, $1,348 for utilities, $239,923 of depreciation, $349 of bank charges, $192 for uniforms/cleaning, and $38,991 of property association fees.

GASP and Greenville GP

The Form 1065 that GASP filed for 2012 reports ordinary business income of $204,609, equal to the excess of $292,050 of gross receipts over $87,441 of total deductions. Schedule K, Partners' Distributive Share Items, of GASP's 2012 return reports a section 179 deduction of $9,300 that is not included in the total deductions taken into account in computing the partnership's ordinary business income. The total deductions of $87,441 include $9,400 for repairs and maintenance, $6,916 for taxes and licenses, and $71,125 of other deductions.

The document the parties stipulated to be a copy of the return GASP filed electronically for 2012 does not include a list of the other deductions. But the record also includes a 2012 return for GASP stamped "Client Copy" and signed

[*12] only by Mr. Daffron as paid preparer. The unsigned copy of GASP's 2012 return provides a list of the $71,125 of other expenses, which includes $6,250 of auto expenses, $7,652 of travel expenses, and $2,247 of meals and entertainment expenses.

### GJ MD, PA

A Form 1120S for GJ MD, PA for 2012 signed only by Mr. Daffron as paid preparer but stipulated by the parties to be the corporation's 2012 return shows an ordinary business loss of $5,924, equal to the excess of $114,739 of total deductions over $108,815 of gross receipts. The total deductions shown on that return include depreciation of $2,846, vehicle expenses of $30,486, travel expenses of $1,782, and meals and entertainment expenses of $6,998.

### Petitioner

The transcript of petitioner's account for his 2012 taxable year shows that respondent prepared a substitute for return for the year on his behalf in August 2014. The transcript also shows the filing of a "duplicate" return in August 2015.

The record includes a Form 1040 for 2012 in petitioner's name that is stamped "Client Copy" and signed only by Mr. Daffron as paid preparer. Petitioner's unsigned return for 2012 shows $6,500 of wages, a capital loss carryover of $1,329, Schedule E income of $190,942, a net operating loss

[*13] carryover of $15,023, and itemized deductions of $77,579. The Schedule E income shown on petitioner's return includes the following amounts:

| | |
|---|---|
| Pemberly nonpassive loss | ($139,395) |
| GEJ, LLC nonpassive loss | (1,408) |
| GASP nonpassive income | 202,563 |
| GASP sec. 179 deduction | (9,207) |
| Greenville GP nonpassive income | 2,026 |
| Greenville GP sec. 179 deduction | (92) |
| Novamed nonpassive income | 13,769 |
| GJ MD, PA nonpassive loss | (5,924) |
| ESOT nonpassive income | 132,811 |
| ESOT sec. 179 deduction | (4,201) |

The net operating loss carryforward of $15,023 equals the excess of the $50,954 loss petitioner reported for 2011 from the sale of the Loma Alta property over his 2011 wages of $24,600 and Schedule E income of $11,331.

### 2013

#### ESOT

Respondent has no record of ESOT's having filed a return for 2013. The record includes an unsigned 2013 return for ESOT that shows ordinary business income of $183,274, equal to the excess of total income of $379,010 over total deductions of $195,736. The total income equals gross receipts of $380,911

[*14] reduced by returns and allowances of $3,561 and increased by $23 of income from Greenville GP and $1,637 of other income. The total deductions include $391 of depreciation, $8,054 of vehicle expenses, $3,179 of travel expenses, $5,491 of payroll service fees, $428 of professional development expenses, $6,667 of amortization, and $3,223 of meals and entertainment expenses. ESOT's unsigned 2013 return also reports a section 179 deduction of $1 and $180 of capital gain and a $1 net rental loss from GEJ, LLC.

### Pemberly and GEJ, LLC

The Form 1065 that Pemberly filed for 2013 includes a Form 8825 for the Plano property that reports no gross rents and total expenses of $10,096. The reported expenses include $1,778 for utilities, $165 of bank service charges, $8,500 of "HOA fees", $12 for office supplies, and ‒$359 labeled "miscellaneous". A Form 8949, Sales and Other Dispositions of Capital Assets, included with Pemberly's 2013 return reports gain of $954,913 from the sale of the Plano property, equal to the excess of $3,809,387 of proceeds over cost or other basis of $2,009,607, and an "IRC Sec. 108 Insolvency Amount" of $844,867. The copy included in the record of Pemberly's 2013 return, as filed, does not include a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., for petitioner,

[*15] but does include a Schedule K-1 for GEJ, LLC. GEJ, LLC's Schedule K-1 allocates to it capital gain of $9,549.

The $9,549 of capital gain allocated by Pemberly to GEJ, LLC appears on Schedule D, Capital Gains and Losses, of the Form 1065 that GEJ, LLC filed for 2013. The Schedules K-1 included with GEJ, LLC's 2013 return allocate $9,454 of that capital gain to petitioner and $95 to ESOT.

The record also includes an unsigned copy of a 2013 return for Pemberly that reports gain from the sale of the Plano property of $1,799,780, equal to the gain reported on Pemberly's return as filed without the claimed insolvency exclusion. Schedules K-1 included with Pemberly's unsigned 2013 return allocate $17,998 of that gain to GEJ, LLC and $1,781,782 to petitioner.

### GASP and Greenville GP

The Form 1065 that GASP filed for 2013 reports ordinary business income of $227,892, equal to the excess of $436,484 of gross receipts over total deductions of $208,592. The total deductions include $5,273 for repairs and maintenance, $275 for taxes and licenses, and $203,044 of "Other deductions". Schedule K of GASP's 2013 return reports a section 179 deduction of $12,604 not taken into account in computing the partnership's ordinary business income. The copy included in the record of GASP's 2013 return, as filed, does not include a

[*16] statement listing the $203,044 of other deductions, but the record also includes an unsigned 2013 return for GASP that provides such a list. According to the unsigned return, those deductions include auto expenses of $23,567, payroll expenses of $3,964, travel expenses of $7,041, and meals and entertainment expenses of $5,345.

### GJ MD, PA

Although the parties stipulated that GJ MD, PA filed a Form 1120S for 2013 on or around July 17, 2015, the record does not include a copy of GJ MD, PA's 2013 return as filed. Instead, the record includes a 2013 return for GJ MD, PA stamped "Client Copy" and signed only by Mr. Daffron, as paid preparer. GJ MD, PA's unsigned 2013 return reports an ordinary business loss of $11,708, equal to the excess of $39,777 of total deductions over gross receipts of $28,069. The deductions include $610 of depreciation, $6,230 of vehicle expenses, and $3,148 of meals and entertainment expenses.

### NTEF

Respondent's records indicate that NTEF did not file a Form 1120S for 2013. An unsigned 2013 return for NTEF that petitioner provided to respondent shows ordinary business income of $62,627, equal to the excess of $264,750 of total income over total deductions of $202,123. The total income shown on

[*17] NTEF's unsigned 2013 return equals the excess of gross receipts of $265,442 over returns and allowances of $692. The deductions include $14,477 of vehicle expenses, $12,078 of travel expenses, and $7,619 of meals and entertainment expenses.

### Petitioner

The transcript of petitioner's account for his 2013 taxable year shows that respondent prepared a substitute for return for the year on his behalf in December 2014. The transcript also shows the filing of a "duplicate" return in October 2015.

The record includes a signed but undated Form 1040 for petitioner for 2013. That return shows wages of $8,500, capital gain of $954,998, Schedule E income of $446,690, and itemized deductions of $8,666. The Schedule D included in that return identifies the capital gain as net long-term capital gain from partnerships, S corporations, estates, and trusts. Accompanying worksheets attribute the gain to three sources: $945,364 from Pemberly, $9,454 from GEJ, LLC, and $180 from ESOT. The Schedule E income shown on petitioner's unsigned 2013 return includes the following amounts:

| | |
|---|---|
| Pemberly nonpassive loss | ($9,995) |
| GEJ, LLC nonpassive loss | (104) |
| GASP nonpassive income | 225,613 |

| | |
|---|---|
| GASP sec. 179 deduction | (12,478) |
| Greenville GP nonpassive income | 2,256 |
| Greenville GP sec. 179 deduction | (125) |
| Novamed nonpassive income | 25,366 |
| GJ MD, PA nonpassive loss | (11,708) |
| ESOT nonpassive income | 183,274 |
| ESOT sec. 179 deduction | (1) |
| ESOT nonpassive loss | (1) |
| NTEF nonpassive income | 62,627 |
| NTEF sec. 179 deduction | (18,034) |

## The Parties' Stipulation of Settled Issues

In a stipulation of settled issues executed before trial, the parties agreed, among other things, that petitioner (1) earned income of $19,800 for 2011 from the rental of the Loma Alta property, (2) is entitled to a loss deduction for 2011 from the sale of the Loma Alta property of $53,154 (which is in excess of the amount shown on his unsigned return for the year), (3) earned wages of $24,600, $6,500, and $8,500 for 2011, 2012, and 2013, respectively, (4) earned taxable interest of $4 for 2011, (5) recognized capital gain of $954,998 for 2013 not attributed to a specific source or transaction, (6) recognized income from the cancellation of debt of $10,624 for 2013, (7) recognized capital gain of $17,998 for 2013 through GEJ LLC, and (8) "is liable for the addition to tax for failure to

[*19] pay estimated income tax under I.R.C. § 6654 for the 2011, 2012, and 2013 taxable years." The parties also agreed that Pemberly earned rental income of $300,000 for 2011 and $150,000 for 2012, that ESOT is entitled to deduct rent expenses of $150,000 for each of 2011 and 2012, and that GJ MD, PA is entitled to deduct rent expenses of $150,000 for 2011.

Documentation Provided To Substantiate Claimed Deductions

In a request for admissions served on petitioner in July 2017, respondent asked for admissions that petitioner could not substantiate the expenses shown on the returns of Pemberly and the other business entities. (In response, petitioner simply denied the requested admissions without further explanation.)

In response to a subpoena, LVI provided 561 pages of documents concerning its relationship with petitioner. The only documentation petitioner provided to substantiate the deductions shown on the returns of his various business entities, in addition to the documents LVI provided, was bank statements and general ledgers. Mr. Daffron explained at trial that he and his daughter prepared the general ledgers for each of petitioner's business entities using the entity's bank statements. He admitted that petitioner was not always timely in providing him the bank statements and that sometimes he did not receive the statements "until years after the fact".

[*20] ESOT's 2011 general ledger includes three separate accounts for professional fees, one labeled "ADP", another labeled "Legal & Accounting", and a third simply "Professional Fees". These three accounts had balances at the end of 2011 of $2,565, $12,150, and $18,362, respectively. The balances of the three accounts sum to the $33,076 of legal and professional expenses shown on ESOT's 2011 tax return (with a $1 rounding difference). The entries in the "Prof. Fees-- ADP" account can be traced to statements of one of ESOT's bank accounts, where they are labeled as "ADP Payroll Fees".

Amended Pleadings

At the close of trial, both parties made oral motions to amend their pleadings to conform to the evidence presented. See Rule 41(b). We granted both parties' motions.

Respondent's Amended Answer

The revised deficiency for 2011 set forth in respondent's amended answer reflects the stipulated wages, taxable interest, and loss from the sale of the Loma Alta property and a standard deduction. The revised deficiency also reflects the following amounts of Schedule E income: $300,000 from Pemberly, $1,062 from GASP, and $816,117 from other sources. The Schedule E income from other sources equals the sum of the gross receipts reported on the 2011 returns of ESOT

[*21] ($847,727) and GJ MD, PA ($248,590) and the $19,800 of stipulated rental income from the rental of the Loma Alta property, reduced by the $300,000 of rent expense deductions respondent agreed to allow to ESOT and GJ MD, PA. Respondent's revised deficiency for 2011 does not take into account the capital loss carryover petitioner reported or the expenses underlying the claimed loss from the rental of the Loma Alta property.

The increased deficiency asserted in respondent's amended answer for 2012 reflects the stipulated wages, $150,000 of Schedule E income from Pemberly, $292,050 of Schedule E income from GASP, $2,046 of Schedule E income from Greenville GP, $616,752 of Schedule E income from other sources, and a standard deduction. The Schedule E income from other sources equals the sum of the $657,937 gross receipts reported on ESOT's 2012 return and the $108,815 of gross receipts shown on the unsigned 2012 return for GJ MD, PA, reduced by the deduction of $150,000 of rent expenses respondent agreed to allow ESOT. Respondent's increased deficiency for 2012 does not take into account the capital loss or the NOL carryover shown on petitioner's unsigned 2012 return.

The increased deficiency for 2013 asserted in respondent's amended answer reflects the stipulated wages and income from the cancellation of debt, $954,998 of stipulated capital gain, and a standard deduction. That deficiency also reflects

**[*22]** the following amounts of Schedule E income: $436,484 from GASP, $2,279 from Greenville GP, $17,998 from GEJ, LLC, and $674,422 from other sources. The Schedule E income from other sources equals the sum of the gross receipts shown on the unsigned 2013 returns of ESOT, GJ MD, PA, and NTEF ($380,911 + $28,069 + $265,442 = $674,422).

Respondent's amended answer asserts smaller amounts of self-employment tax for each of the years in issue than the amounts determined in the notice of deficiency. The calculations supporting the deficiencies stated in the amended answer do not identify the sources of income that respondent treated as self-employment income.

Petitioner's Amended Petition

In his amended petition, petitioner assigns error to respondent's refusal to allow deductions shown on his or his business entities' tax returns and the "assessment" of self-employment tax.[4] Petitioner's amended petition also assigns

---

[4]Regarding the deductions in issue, petitioner goes on to aver that "[t]he deficiencies should be reduced by the amount of the deductions claimed on the returns for all of the taxpayers". That averment is, of course, incorrect. Any deductions allowed for a year would not reduce that year's deficiency dollar-for-dollar; they would instead reduce the taxable income on which the deficiency would be computed. And respondent has not yet assessed self-employment tax and will be unable to do so until our decision in this case becomes final. See sec. 6213(a).

[*23] error to respondent's determination of additions to tax under section 6651(a)(1) but does not address the additions to tax under section 6651(a)(2). The amended petition does, however, assign error to respondent's determination of additions to tax under section 6654, even though petitioner had previously stipulated his liability for those amounts.[5]

## OPINION

### I. Introduction: Treatment of Passthrough Entities

The income and expenses of the partnerships and S corporations that petitioner owns directly or indirectly are relevant to this proceeding because the entities are not themselves subject to Federal income taxation. Instead, their income and expenses "flow through" and are taken into account in determining the Federal income tax liability of their owners.

Section 702(a) requires each partner in a partnership to "take into account separately his distributive share" of specified items of the partnership. Items that need not be separately stated are combined into a single category, "taxable income or loss, exclusive of items requiring separate computation". Sec. 702(a)(8).

---

[5]On brief, petitioner acknowledged his stipulation of liability for estimated tax penalties and his mistake in assigning error to respondent's determination of those penalties.

**[*24]** A corporation that makes an S election under section 1362(a) is treated for Federal income tax purposes in manner broadly similar to that accorded to partnerships. Shareholders of an S corporation, in determining their tax liability for the year, must take into account their share of specified tax items of the corporation and their share of its "nonseparately computed income or loss." Sec. 1366(a)(1)(B).

The unified audit and litigation rules enacted by the Tax Equity and Fiscal Responsibility Act of 1982 and in effect before 2018 generally require the tax items of partnerships to be determined in entity-level proceedings. Those rules, however, do not apply to the present case. Section 301.6231(c)-6(a), Proced. & Admin. Regs., provides:

> The treatment of items as partnership items with respect to a partner whose taxable income is determined by use of an indirect method of proof of income will interfere with the effective and efficient enforcement of the internal revenue laws. Accordingly, partnership items of such a partner arising in any partnership taxable year ending on or before the last day of the taxable year of the partner for which a deficiency notice based upon an indirect method of proof of income is mailed to the partner shall be treated as nonpartnership items as of the date on which that deficiency notice is mailed to the partner.

Petitioner does not dispute respondent's contention that he based the notice of deficiency on substitutes for returns prepared on the basis of bank deposits analyses. Although we have found no authority on the question of what

**[\*25]** constitutes an indirect method of proof of income for purposes of section 301.6231(c)-6, Proced. & Admin. Regs., we accept respondent's claim that a bank deposits analysis is one such method. As we wrote in <u>Kling v. Commissioner</u>, T.C. Memo. 2001-78, 2001 WL 309060, at \*8: "The bank deposits method is an accepted method of income reconstruction when a taxpayer has inadequate books and records and large bank deposits." We thus assume that the bank deposits method was among those whose use the drafters of section 301.6231(c)-6, Proced. & Admin. Regs., intended to convert partnership items into nonpartnership items.

## II. 2013 Capital Gain

The increased deficiency respondent asserts in his amended answer for 2013 takes into account capital gain of $954,998. Petitioner's late-filed 2013 return shows the same amount of capital gain. And the parties' stipulation of settled issues states their agreement that petitioner earned specified amounts of income, including $954,998 labeled "Capital Gain". On the surface, it would seem the parties have no disagreement. But the matter is not that simple.

Although the stipulation of settled issues does not identify the $954,998 of stipulated capital gain with a specific source or transaction, the record makes it clear that the gain arises from Pemberly's sale of the Plano property. The stipulated gain matches the amount reported on petitioner's 2013 return, which

[*26] attributed $945,364 of the gain to Pemberly, $9,454 to GEJ, LLC, and $180 to ESOT. The gain attributed to Pemberly equals 99% of the $954,913 of gain reported on the partnership's 2013 return. The gain attributed to GEJ, LLC equals 99% of the portion of Pemberly's gain allocated to GEJ, LLC on the Schedule K-1 included with Pemberly's return. And the $180 of gain attributed to ESOT equals the gain reported on that entity's unsigned 2013 return as its share of GEJ, LLC's gain. That amount equals ESOT's distributive share, as a 1% partner in GEJ, LLC, of the $17,998 of gain allocated to GEJ, LLC on Pemberly's unsigned 2013 return, which did not claim an insolvency exclusion in computing the taxable gain from the sale of the Plano property.

In determining petitioner's share of Pemberly's ordinary income under section 702(a)(8) for the years in issue, respondent did not take into account any of the depreciation (or other) deductions Pemberly claimed on its partnership returns for those years. When Pemberly computed its gain from the sale of the Plano property, it compared the amount it received for the property to its adjusted basis in the property in accordance with section 1001(a). Petitioner claims that the adjusted basis Pemberly used to compute its gain had been reduced (and that the gain from the sale of the property had therefore been increased) by the depreciation deductions that respondent has not taken into account in computing

[*27] petitioner's income from the partnership. Alleging an inconsistency in respondent's position, petitioner asserts that the parties' stipulation regarding the amount of his 2013 capital gain "is limited by the acceptance of previous depreciation deductions." In other words, he contends that respondent's failure to reduce his income from Pemberly by the depreciation deductions the partnership reported renders "void" the stipulation of his capital gain.

The record presents a further complication. The list of income items that the parties stipulated petitioner to have received includes not only $954,998 of capital gain for 2013 that is not further identified, but also an additional $17,998 of capital gain specifically identified as petitioner's share of gain of GEJ, LLC. That amount, again, is GEJ, LLC's share of the gain from the sale of the Plano property shown on Pemberly's unsigned 2013 return, without regard to any insolvency exclusion.

Faced with that convoluted record, we must decide whether justice requires allowing a modification of the parties' stipulations concerning petitioner's 2013 capital gain. Rule 91(a)(1) requires parties before this Court to stipulate as fully as possible "all matters not privileged which are relevant to the pending case, regardless of whether such matters involve fact or opinion or the application of law to fact." Rule 91(e) provides: "A stipulation shall be treated, to the extent of

[*28] its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires."

We agree with petitioner that justice requires modification of the parties' capital gain stipulations, but not to the extent petitioner requests. Our review of the record demonstrates that the stipulated amounts include a double counting not apparent on the face of the stipulation. The $954,998 of capital gain not specifically identified in fact includes GEJ, LLC's share of the gain from the sale of the Plano property shown on Pemberly's 2013 return as filed. And the $17,998 of capital gain specifically attributed to GEJ, LLC is that entity's share of the gain from the same transaction shown on Pemberly's unsigned 2013 return. Requiring petitioner to include in his taxable income both amounts of capital gain would overstate his income.

The prospect of arithmetic errors in stipulated amounts that might result in a double counting of income does not require relieving a taxpayer from the stipulation. See Korangy v. Commissioner, T.C. Memo. 1989-2, 56 T.C.M. (CCH) 989 (1989), aff'd, 893 F.2d 69 (4th Cir. 1990). The stipulation at issue in Korangy involved the amount of the taxpayers' taxable income for a year from

[*29] unexplained deposits to their bank account. After the taxpayers agreed to the stipulation, they determined that one of the deposits had inadvertently been included twice in computing the agreed sum. We acknowledged in Korangy v. Commissioner, 56 T.C.M. (CCH) at 991, "that the compromise and settlement of tax cases is governed by general principles of contract law", but we rejected the taxpayers' claim that the stipulation reflected a mutual mistake. We explained:

> [The taxpayers] contend that the amount of "Unexplained Deposits" set forth in the Stipulation was based on a list of specific bank deposits, and that the list contains an error, only recently detected by them, which causes the amount of deposits in the Stipulation to be overstated. The Stipulation, however, contains no proviso that the amount of taxable income included under "Unexplained Deposits" is necessarily attributable to specific deposits * * *. Rather, the Stipulation only sets out for each line item the dollar amount upon which * * * [the Commissioner] agreed to settle the case. If * * * [the taxpayers] thought that they were agreeing to inclusion in their taxable income only of specific deposits, rather than a lump-sum dollar amount, * * * they should have made sure the Stipulation reflected any such condition. * * * Therefore, to the extent that any mistake was made in the Stipulation, we find that it was merely a unilateral mistake on the part of * * * [the taxpayers], and we hold that * * * the terms of the Stipulation will be enforced.

Id. at 991-992. We also rejected the taxpayers' claim that the Commissioner would not be prejudiced by the granting of their motion. Rejecting the agreed settlement in part, we observed, would require the Commissioner to prepare for and conduct a trial concerning the amount of the taxpayers' income from

[*30] unexplained bank deposits. Following that course would burden the Commissioner and result in "an additional waste" of our own resources. Id. at 992. Therefore, we "perceive[d] of no injustice in holding the parties to the terms of their Stipulation." Id.

The facts of the present case are similar to those of Korangy in some respects but different in others. The most significant difference, in our view, is that the record in the case before us makes clear that the stipulated amounts count the same capital gain twice. The double counting is not an unproven allegation but an established fact. To remedy that obvious error, we will disregard the parties' stipulation that petitioner recognized $17,998 of capital gain for 2013 of GEJ, LLC.[6] GEJ, LLC's only source of capital gain was Pemberly's sale of the Plano property. And the $954,998 of capital gain that the parties stipulated includes GEJ, LLC's share of the gain from that sale after taking into account the insolvency exclusion claimed on Pemberly's 2013 return (which we do not understand respondent to challenge).

---

[6]Our disregarding the $17,998 of stipulated gain from GEJ, LLC will not only redress the double counting of gain; it will also address respondent's mischaracterization of that gain in computing the increased deficiency for 2013 that he asserted in his amended answer. In computing the increased deficiency for 2013, respondent treated the $17,998 of stipulated capital gain from GEJ, LLC as ordinary income.

**[*31]** That leaves us with petitioner's complaint, which alludes to an overstatement of income from another cause. To the extent that Pemberly reduced its basis in the Plano property by depreciation that respondent has not taken into account in determining petitioner's ordinary income from Pemberly for the years in issue, respondent's position involves an undeniable inconsistency. But we find that potential overstatement of income analogous to the one in Korangy. The stipulation that petitioner recognized $954,998 of capital gain for 2013 contains no proviso that it is attributable to a specific amount realized or adjusted basis. If petitioner based his agreement to the stipulation on such a condition, he should have ensured that the stipulation reflected that condition. As a result of the request for admissions he received from respondent in July 2017, petitioner had reason to know, when he signed the stipulation of settled issues the following March, that respondent was challenging the deductions Pemberly claimed on its returns for the years in issue.

Petitioner claims that respondent's inconsistent treatment of Pemberly's depreciation could be remedied by a "simple calculation". We are not convinced. If the calculation were as simple as petitioner alleges, we expect he would have provided it to us. His failure to do so is telling. Petitioner suggests that his reported capital gain be reduced by the amount of denied depreciation. But the

[*32] record does not establish how much of that depreciation Pemberly applied to reduce its adjusted basis in the Plano property. Pemberly's returns do establish that all of the depreciation it claimed for 2011 and 2012 related to the Plano property. But we find nothing in the record that details Pemberly's calculation of its adjusted basis. We might surmise that the reported basis was reduced by the full amount of depreciation Pemberly reported for 2011 and 2012, but we cannot know for sure.

We therefore agree with respondent that, were we to set aside the stipulation of $954,998 of capital gain, we would have to reopen the record "to determine how the gain was computed," which would involve "the production of additional documents and testimony" from petitioner's accountant and perhaps from petitioner himself. In that respect, as well, the present case is similar to Korangy. Because we can redress the double counting of the capital gain petitioner earned through GEJ, LLC without further proceedings, we will do so. By contrast, redressing the possible inconsistency in respondent's treatment of Pemberly's depreciation cannot be remedied so simply. Moreover, petitioner could have protected himself from inconsistent treatment by conditioning the stipulation on a specified amount of basis, reflecting specified amounts of depreciation. We will therefore allow modification of the parties' stipulations of petitioner's 2013 capital

[*33] gain only to eliminate the $17,998 of capital gain from GEJ, LLC, with no adjustment of the $954,988 of capital gain not attributed to a specific source.

III.    Petitioner's Income From Partnerships and S Corporations

The deficiencies respondent asserts in his amended answer reflect his determination that petitioner earned income from partnerships and S corporations of $1,097,379, $1,060,848, and $1,131,183 for 2011, 2012, and 2013, respectively.  By contrast, petitioner's returns for those years show corresponding amounts of $11,331, $190,942, and $446,690.  The principal difference between the amounts respondent determined and those shown on petitioner's returns is that petitioner reduced his income from the entities by expenses shown on their returns.  With few exceptions, respondent declined to take those expenses into account because of petitioner's failure to substantiate them.

In general, section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  Taxpayers are also allowed "itemized" deductions for specified personal, family, or living expenses.  When called upon by the Commissioner, however, a taxpayer must substantiate his expenses.  See, e.g., Callender v. Commissioner, T.C. Memo. 2016-68, at *7; see also sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

**[*34]** Section 274(d) imposes heightened substantiation requirements for deductions or credits for traveling expenses, expenses for gifts, amounts with respect to "listed property", and items "with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, or with respect to a facility used in connection with such an activity".  To meet those requirements, a taxpayer must

> substantiate[] by adequate records or by sufficient evidence corroborating the taxpayer's own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility or property, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility or property, or receiving the gift.

Sec. 274(d).  Thus, a taxpayer can meet the substantiation requirement in either of two ways:  by means of adequate records, or by the taxpayer's own statement, corroborated by "sufficient evidence".  Section 280F(d)(4) defines the term "listed property" to include, among other things, passenger automobiles and "any other property used as a means of transportation".  Sec. 280F(d)(4)(A)(i) and (ii).  By its terms, however, section 274(d) does not apply to any "qualified nonpersonal use vehicle", which section 274(i) defines to "mean[] any vehicle which, by reason of its nature, is not likely to be used more than a de minimis amount for personal

**[*35]** purposes." The regulations list as examples of qualified nonpersonal use vehicles such special purpose vehicles as police cars, fire engines, ambulances, cement mixers, and school buses. Sec. 1.274-5(k)(2)(ii), Income Tax Regs.

The regulations detail how a taxpayer can meet the "adequate records" requirement of section 274(d). See sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Those regulations require a taxpayer to maintain "an account book, diary, log, statement of expense, trip sheet, or similar record" in which the taxpayer records the expenditure or use of property "at or near the time of the expenditure or use." Id. subdiv. (i) and (ii). To meet the requirement of contemporaneous recording, the taxpayer must record "the elements of an expenditure or use * * * at a time when, in relation to the use or making of an expenditure, the taxpayer has full present knowledge of each element of the expenditure or use, such as the amount, time, place, and business purpose of the expenditure and business relationship." Id. subdiv. (ii)(A), 50 Fed. Reg. 46018.

The regulations also provide guidance on how a taxpayer that does not meet the adequate records requirement can substantiate a claimed deduction by meeting the alternative "sufficient evidence" test. See id. subpara. (3), 50 Fed. Reg. 46020. To meet that test, the taxpayer must comply with each of the elements required by

[*36] section 274(d), in regard to an expenditure or use of property, by a combination of the taxpayer's "own statement, whether written or oral" and "other corroborative evidence". Sec. 1.274-5T(c)(3)(i)(A) and (B), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). To establish the amount, time, place, or date of an expenditure or use, the taxpayer's own statement must be corroborated by direct evidence. Id. subpara. (3)(i). A taxpayer's statement in regard to his business relationship to persons entertained or the business purpose of an expenditure, however, may be corroborated by circumstantial evidence. Id., 50 Fed. Reg. 46021.

In the case of expenses not covered by section 274(d), the Court may estimate the amounts of allowable deductions when there is evidence that the taxpayer incurred deductible expenditures. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

A.    2011

1.    ESOT

In computing the deficiency for 2011 asserted in his amended answer, respondent determined that petitioner had nonseparately computed income from ESOT, within the meaning of section 1366(a)(1), of $697,727, equal to the $847,727 of gross receipts shown on ESOT's 2011 return reduced by $150,000 of

**[*37]** rent expenses--the only reported expenses of ESOT's for 2011 that respondent accepts as adequately substantiated. By contrast, petitioner's 2011 return shows income of $170,273 from ESOT, which equals the $847,727 of reported gross receipts reduced by the returns and allowances, cost of goods sold, and deductions reported on ESOT's 2011 return.

Three of the categories of expenses ESOT reported--auto/truck, meals and entertainment, and travel--are subject to the heightened substantiation requirements of section 274(d). Petitioner asserts that ESOT's auto/truck expense arose from his use of rental vehicles to transport equipment to various offices out of which he worked. He claims that, because "he worked long hours while at the destination * * * all such leased vehicle expenses are believed to qualify under the exception" for qualified nonpersonal use vehicles. We fail to understand, however, how the length of time petitioner spent working at an office to which he traveled by a leased vehicle necessarily affected the vehicle's suitability for personal uses. And we view it as highly unlikely that, even if he had sought one, petitioner would have been able to obtain from a commercial car rental company a special purpose vehicle of the type listed in section 1.274-5(k)(2)(ii), Income Tax Regs.

[*38] In regard to the other expenses subject to section 274(d), petitioner makes only general arguments that his testimony and the documentation he provided comply with the heightened substantiation rules. The general ledgers and bank statements, however, fail to provide the information required by section 274(d). Petitioner also refers us to the documents submitted by LVI, but he does not refer to specific pages that provide the required information for specific expenses ESOT reported. We thus conclude that petitioner has not substantiated ESOT's auto/truck, meals and entertainment, or travel expenses as required by section 274(d) and that those expenses thus do not reduce his nonseparately computed income from ESOT for 2011.

Turning to those offsets to income that ESOT reported for 2011 that are not subject to section 274(d), we begin by noting petitioner's failure to address ESOT's returns and allowances. We thus treat him as conceding that his income from ESOT for 2011 cannot be reduced by any amount for returns and allowances. See Ashkouri v. Commissioner, T.C. Memo. 2019-95, at *24.

Petitioner claims that ESOT's 2011 tax return adequately substantiates the reported depreciation. A taxpayer's return, however, "is not sufficient to substantiate deductions claimed on it." Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). When, at the conclusion of the trial, we offered petitioner's counsel

[*39] guidelines for briefing, we suggested, in regard to depreciation, that he document the purchase of the item in question, when it was placed in service, and the amount of depreciation reported for prior years. We agree with respondent that petitioner's briefs do not comply with that directive.[7] Therefore, we conclude that petitioner cannot reduce his income from ESOT for 2011 by any of the depreciation expense the corporation reported on its return for that year.

In regard to ESOT's amortization expense for 2011, petitioner directs us to Mr. Daffron's testimony that it relates to goodwill arising from petitioner's purchase of ESOT. But petitioner provides no documentation of the price he paid for the entity or how that price was allocated among its various assets. We thus conclude that petitioner's income from ESOT for 2011 cannot be reduced by any amount for amortization of goodwill or any other intangible asset. Cf. sec. 197(a) (allowing deductions for amortization of specified intangible assets).

In regard to the remainder of ESOT's reported expenses, the entity's general ledger and the bank statements from which it was prepared establish, in some

---

[7]In addition to referring us to ESOT's 2011 tax return to substantiate the depreciation expense it reported, petitioner also directs us to the entity's general ledger. Of the two pages petitioner cites, however, only one shows the amount of expense ESOT reported on its return, where it appears as a single journal entry. That ESOT recorded in its general ledger the same amount of depreciation it claimed on its return does not establish that the reported amount was correct.

[*40] cases, the amount of the expenditure and the person or entity to whom it was made. But with the sole exception of the portion of professional fees recorded in the ADP account, those documents do not establish that the payment was an ordinary and necessary business expense. In regard to the amounts recorded in the "Prof. Fees--ADP" account, we find that the bank statements adequately establish not only the payments to ADP but also the business purpose they served. Therefore, we conclude that petitioner's income from ESOT for 2011 can be reduced by the $2,565 recorded in that general ledger account.

That ESOT's general ledger and bank statements do not fully substantiate the other reported expenses does not mean that petitioner's income from ESOT cannot be reduced by any of those amounts. As noted above, Cohan allows us to estimate acknowledged expenses that a taxpayer cannot fully substantiate. But petitioner did not invoke Cohan in his initial brief. And petitioner's specific circumstances give us grounds to decline to rely on Cohan to estimate the amount of ESOT's deductible expenses that he failed to substantiate. As the Court of Appeals for the Second Circuit observed in Cohan v. Commissioner, 39 F.2d at 543, not only did the taxpayer in that case fail to keep account of his travel expenses; he "probably could not have done so." That observation suggests a limit on Cohan's scope, under which estimating unsubstantiated expenses would be

[*41] inappropriate when proper recordkeeping is feasible and can reasonably be expected. In fact, the Court of Appeals for the Seventh Circuit has recognized just such a limitation, identifying a trend under which Cohan, "while not * * * repudiate[d] * * * entirely, is * * * not invoke[d] * * * where the claimed but unsubstantiated deductions are of a sort for which the taxpayer could have and should have maintained the necessary records." Lerch v. Commissioner, 877 F.2d 624, 628 (7th Cir. 1989), aff'g T.C. Memo. 1987-295. Thus, we might justifiably decline to apply Cohan because petitioner could have kept adequate records. We do not take his failure to do so as the result of inevitable exigencies in the practice of ophthalmology.

Respondent, however, accepts that we "may utilize Cohan to estimate some of petitioner's expenses". Therefore, under Cohan, we will allow petitioner to reduce his income from ESOT for 2011 by a portion of those of the corporation's reported expenses not subject to section 274(d) other than the ADP payroll fees (which we have found to be fully substantiated) and depreciation and amortization (which we have found not to be substantiated at all).

To estimate ESOT's deductible expenses for 2011 other than the amounts either allowed or disallowed in full, we reviewed ESOT's general ledger for the year and the bank statements from which it was prepared. We were aided in that

[*42] regard by petitioner's use of ESOT's 2011 taxable year on brief as something of a test case. The expenses of that entity for that year are the only ones that petitioner attempted to substantiate by references to the record. Our review covered expenses of $419,147, equal to the sum of ESOT's reported cost of goods sold and total expenses ($82,743 + $583,556 = $666,299) reduced by those expenses to which section 274(d) applies (auto/truck expenses of $41,767, meals and entertainment expenses of $4,133, and travel expenses of $25,563), those expenses we have disallowed in full (depreciation of $7,124 and $16,000 of amortization), the $150,000 rent expense respondent conceded, and the $2,565 of ADP payroll fees we have allowed in full. Relying on petitioner's brief, we attempted to trace those $419,147 of expenses to specific expenditures shown on ESOT's bank statements. When we could, we considered whether, given the payee shown on the bank statement or accompanying canceled check, it was plausible-- even if not fully documented--that the payment to that person or entity was an ordinary and necessary business expense of ESOT's. We found that expenditures totaling $153,576 met those criteria. The Court of Appeals for the Second Circuit in Cohan v. Commissioner, 39 F.2d at 544, allows us, in estimating expenses, to "bear[] heavily * * * upon the taxpayer whose inexactitude is of his own making." Mindful of that license, and our finding that the connection between the $153,576

[*43] of expenditures meeting our criteria and ESOT's business is only plausible and not fully substantiated, we conclude that, under Cohan, petitioner should be allowed to reduce his income from ESOT by 50% of those expenditures, or $76,788 (18.3% of the $419,147 of expenditures covered by our review).

We therefore conclude that petitioner's nonseparately computed income from ESOT for 2011 is $618,374, computed as follows:

| | |
|---|---|
| Gross receipts | $847,727 |
| Rent expense | (150,000) |
| ADP payroll fees | (2,565) |
| Estimated additional expenses | (76,788) |
| Nonseparately stated income | 618,374 |

### 2. Pemberly and GEJ, LLC

The deficiency for 2011 that respondent asserts in his amended answer takes into account Pemberly's $300,000 of stipulated gross rents for the year (which equal the gross rents Pemberly reported on its 2011 return). Petitioner's 2011 return shows a loss from Pemberly of $41,956, equal to 99% of the excess of Pemberly's reported expenses ($342,380) over the $300,000 of reported gross rents. Petitioner's return also shows a loss of $424 from GEJ, LLC, equal to 1% of the excess of Pemberly's reported expenses over its gross rents.

**[*44]** Petitioner does not cite any evidence in the record to substantiate the expenses Pemberly reported. He claims that Pemberly's tax return substantiates the $265,334 of reported depreciation. We have already addressed that claim above in regard to ESOT's reported depreciation. Petitioner characterizes as "nominal" Pemberly's other expenses.

Because the descriptions of Pemberly's other expenses do not indicate that they are subject to section 274(d), we will estimate the deductible portions of those expenses using the same percentage we derived in our analysis of ESOT's general ledger and bank statements. We thus conclude that petitioner's income from Pemberly and GEJ, LLC for 2011 was $285,901, the excess of Pemberly's gross rents of $300,000 over 18.3% of its reported expenses other than depreciation ($342,380 − $265,334 = $77,046; $77,046 × .183 = $14,099).

### 3. GASP and Greenville GP

In computing the deficiency for 2011 asserted in his amended answer, respondent took into account $1,062 of income from GASP. That amount equals the gross receipts GASP reported on its 2011 Form 1065, with no reduction for any reported expenses. Petitioner's 2011 return shows a loss from GASP of $1,538, equal to 99% of the excess of the total deductions GASP reported ($2,616) over its gross receipts. Petitioner's return also shows a $16 loss from Greenville

[*45] GP, equal to 1% of the excess of GASP's reported deductions over its gross receipts.

Petitioner declined to provide us with "a detailed analysis" of GASP's reported expenses on the grounds that its expenses "were generally the same as those of ESOT."

Of the expenses GASP reported on its 2011 return, the $16 claimed for meals and entertainment expenses is the only one subject to section 274(d). We will disallow in full the deduction of these expenses. To determine the deductible portion of GASP's remaining expenses ($2,616 – $16 = $2,600), we will again use the percentage we derived from our analysis of ESOT's general ledger and bank statements. We thus conclude that petitioner's income from GASP and Greenville GP was $587 ($1,062 – ($2,600 × .183)).

### 4. GJ MD, PA

The deficiency for 2011 that respondent asserts in his amended answer takes into account $98,590 of income from GJ MD, PA, equal to the gross receipts GJ MD, PA reported on its 2011 return ($248,590) over $150,000 of rent expenses. By contrast, petitioner's 2011 return shows a loss of $59,249 from GJ MD, PA, equal to the excess of the entity's $307,839 of reported expenses over its reported gross receipts.

[*46] Again, petitioner declined to provide us with "a detailed analysis" of GJ MD, PA's reported expenses because that entity's expenses "were generally the same as those of ESOT." As was the case with ESOT, we will disallow entirely GJ MD, PA's $2,500 of reported depreciation and those expenses subject to section 274(d) (auto/truck expenses of $18,531, meals and entertainment expenses of $20,788, travel expenses of $21,136 and professional development expenses of $3,860). In estimating under Cohan the deductible portion of GJ MD, PA's reported expenses other than rent ($152,037), depreciation ($2,500), and those expenses subject to section 274(d) ($307,839 – $152,037 – $2,500 – $18,531 – $20,788 – $21,136 – $3,860 = $88,987), we will again use the percentage we derived from our analysis of ESOT's general ledger and bank statements. We thus conclude that petitioner's income from GJ MD, PA for 2011 was $82,305 ($248,590 – $150,000 – ($88,987 × .183)).

  B. <u>2012</u>

    1. <u>ESOT</u>

In computing the deficiency for 2012 asserted in his amended answer, respondent determined that petitioner had nonseparately computed income from ESOT of $507,937, equal to the $657,937 of gross receipts ESOT reported on its 2012 return reduced by $150,000 of rent expenses--again, the only reported

[*47] expenses of ESOT's for the year that respondent accepts as adequately substantiated. By contrast, petitioner's 2012 return shows nonpassive income from ESOT of $132,811 and a separately allocated section 179 deduction of $4,201. The nonpassive income from ESOT shown on petitioner's return equals the excess of the total income of $661,253 ESOT reported on its return over $528,442 of total deductions (exclusive of the separately allocated section 179 deduction).

Section 179(a) allows a taxpayer to deduct a portion of the cost of depreciable property in the year the property is placed in service rather than treating the full cost as a capital expenditure subject to depreciation over a specified period. Section 179(b) provides limits on the costs that can be taken into account under section 179(a) and the deduction allowed by that section. In the case of depreciable property placed in service by a partnership or an S corporation, the limits apply at both the entity and the owner levels. Sec. 179(d)(8). Consequently, an S corporation must separately state each shareholder's share of the corporation's section 179 deduction rather than taking the deduction into account in determining the shareholder's nonseparately computed income or loss. See sec. 1366(a)(1); sec. 1.1366-1(a)(2)(vi), Income Tax Regs. (Partnerships must also separately state their section 179 deductions. See sec. 1.702-1(a)(8)(ii), Income Tax Regs.)

**[*48]** We will treat ESOT's reported offsets to income for 2012 in the same manner we treated the amounts it reported for 2011, accepting respondent's concession of rental expenses and disallowing in full any offset for sales returns and allowances, any cost recovery deductions (i.e., the section 179 deduction, amortization of $16,000 and $3,760 of depreciation), or the deduction of expenses subject to section 274(d) (i.e., $18,535 of vehicle expenses, $19,091 of travel expenses, and meals and entertainment expenses of $14,718). We will allow the deduction of 18.3% of the remaining expenses ($528,442 – $150,000 – $16,000 – $3,760 – $18,535 – $19,091 – $14,718 = $306,338). We therefore conclude that petitioner's income from ESOT for 2012 is $460,038 ($657,937 + $8,161 – $150,000 – ($306,338 × .183)).

### 2. Pemberly and GEJ, LLC

The deficiency for 2012 that respondent asserts in his amended answer takes into account the $150,000 of Pemberly's stipulated gross rents (which equal the gross rents Pemberly reported on its 2012 return). Petitioner's 2012 return shows a loss from Pemberly of $139,395, equal to 99% of the excess of Pemberly's reported expenses of $290,803 over the $150,000 of reported gross rents. Petitioner's 2012 return also shows a loss of $1,408 from GEJ, LLC, equal to 1% of the excess of Pemberly's reported expenses over its gross rents.

**[*49]** Treating the expenses shown on Pemberly's unsigned 2012 return in the same manner we treated Pemberly's reported expenses for 2011, we conclude that petitioner's income from Pemberly and GEJ, LLC for 2012 was $140,689, the excess of Pemberly's gross rents of $150,000 over 18.3% of its expenses other than depreciation ($290,803 − $239,923 = $50,880; $50,880 × .183 = $9,311).

### 3. GASP and Greenville GP

In computing the deficiency for 2012 asserted in his amended answer, respondent took into account $292,050 of income from GASP, equal to the gross receipts the partnership reported on its 2012 return. Petitioner's 2012 return shows $202,563 of nonpassive income and a $9,207 section 179 deduction from GASP. The nonpassive income equals 99% of the ordinary business income GASP reported on its return ($292,050 of income − $87,441 total deductions = $204,609). The section 179 deduction shown on petitioner's return is 99% of GASP's separately stated deduction. Petitioner's 2012 return also shows $2,026 of nonpassive income and a $92 section 179 deduction from Greenville GP (in each case, 99% of 1% of the amounts GASP reported).

Treating GASP's reported expenses in the same manner we treated the entity's expenses for 2011, we will disallow those of GASP's reported expenses subject to section 274(d) (auto expenses of $6,250, travel expenses of $7,652, and

[*50] $2,247 of meals and entertainment expenses) and allow 18.3% of the remaining expenses. We thus conclude that petitioner's income from GASP and Greenville GP for 2012 was $279,004 ($292,050 – (.183 × ($87,441 – $6,250 – $7,652 – $2,247))).

>    4.    GJ MD, PA

The deficiency for 2012 that respondent asserts in his amended answer takes into account $108,815 of income from GJ MD, PA, equal to the gross receipts the corporation reported on its 2012 return. By contrast, petitioner's 2012 return shows a loss of $5,924 from GJ MD, PA, equal to the ordinary business loss the corporation reported ($108,815 of income – $114,739 total deductions).

We will treat GJ MD, PA's reported expenses for 2012 in the same manner as we treated its expenses for 2011. In particular, we will disallow the depreciation deduction of $2,846 and the deduction of those expenses subject to section 274(d) (vehicle expenses of $30,486, travel expenses of $1,782, and meals and entertainment expenses of $6,998) and allow the deduction of 18.3% of the remaining expenses ($114,739 – $2,846 – $30,486 – $1,782 – $6,998 = $72,627). We therefore conclude that petitioner's income from GJ MD, PA for 2012 is $95,524 ($108,815 – ($72,627 × .183)).

**[\*51]** C.    2013

    1.    ESOT

In computing the deficiency for 2013 asserted in his amended answer, respondent determined that petitioner had income from ESOT of $380,911, equal to the gross receipts reported on an unsigned copy of a return for ESOT for 2013. By contrast, petitioner's 2013 return shows nonpassive income from ESOT of $183,274, along with a section 179 deduction of $1. The nonpassive income from ESOT shown on petitioner's 2013 return equals the ordinary business income shown on ESOT's unsigned 2013 return (gross receipts of $380,911 increased by $23 of income from Greenville GP and $1,637 of other income and reduced by returns and allowances of $3,561 and total deductions of $195,736).

We will treat the offsets to income shown on ESOT's unsigned 2013 return in the same manner we treated the amounts it reported for 2011 and 2012. That is, we will allow the deduction of payroll service fees ($5,491) and disallow in full any offset for sales returns and allowances, any cost recovery deductions (depreciation of $391 and $6,667 of amortization) or the deduction of expenses subject to section 274(d) (vehicle expenses of $8,054, travel expenses of $3,179, professional development expenses of $428, and meals and entertainment expenses of $3,223). We will allow the deduction of 18.3% of the remaining

[*52] expenses ($195,736 − $5,491 − $391 − $6,667 − $8,054 − $3,179 − $428 − $3,223 = $168,303). We therefore conclude that petitioner's income from ESOT for 2013 is $346,258 ($380,911 + $1,637 − $5,491 − ($168,303 × .183)).

### 2. Pemberly and GEJ, LLC

Petitioner's 2013 return shows a loss from Pemberly of $9,995, equal to 99% of the $10,096 loss reported on the return Pemberly filed for the year. Petitioner's return also shows a loss of $104 from GEJ, LLC. Treating the expenses Pemberly reported for 2013 in the same manner we treated its expenses for 2011 and 2012, we conclude that petitioner had a loss from Pemberly and GEJ, LLC of $1,848 (18.3% of $10,096).

### 3. GASP and Greenville GP

In computing the deficiency for 2013 asserted in his amended answer, respondent took into account $436,484 of income from GASP, equal to the gross receipts the partnership reported on its 2013 return. Petitioner's 2013 return shows $225,613 of nonpassive income and a $12,478 section 179 deduction from GASP. The nonpassive income equals 99% of the ordinary business income of $227,892 (gross receipts less $208,592 of total deductions) that GASP reported on its 2013 return. The section 179 deduction shown on petitioner's return is 99% of GASP's separately stated deduction. Petitioner's 2013 return also shows $2,256 of

[*53] nonpassive income and a $125 section 179 deduction from Greenville GP (in each case, 99% of 1% of the amounts GASP reported).

Consistent with our treatment of the expenses of GASP and other entities for other years, we will allow in full the deduction of payroll expenses ($3,964) and disallow the section 179 deduction and the deduction of any expenses subject to section 274(d) (auto expenses of $23,567, travel expenses of $7,041, and meals and entertainment expenses of $5,345). We will allow the deduction of 18.3% of the remaining expenses ($208,592 − $3,964 − $23,567 − $7,041 − $5,345 = $168,675). We thus conclude that petitioner's income from GASP and Greenville GP for 2013 was $401,652 ($436,484 − $3,964 − ($168,675 × .183)).

### 4. GJ MD, PA

The deficiency for 2013 that respondent asserts in his amended answer takes into account $28,069 of income from GJ MD, PA, equal to the gross receipts shown on the corporation's unsigned 2013 return. By contrast, petitioner's 2013 return shows a nonpassive loss of $11,708 from GJ MD, PA, equal to the ordinary business loss shown on the corporation's unsigned 2013 return (gross receipts less $39,777 of total deductions).

We will treat the expenses shown on GJ MD, PA's unsigned 2013 return in the same manner as we treated its expenses for 2011 and 2012. We will disallow

[*54] deductions for depreciation ($610) and expenses subject to section 274(d) ($6,230 of vehicle expenses and $3,148 of meals and entertainment expenses). And we will allow the deduction of 18.3% of the remaining expenses ($39,777 – $610 – $6,230 – $3,148 = $29,789). We therefore conclude that petitioner's nonseparately stated income from GJ MD, PA for 2013 is $22,618 ($28,069 – ($29,789 × .183)).

    5.    NTEF

The deficiency for 2013 that respondent asserts in his amended answer takes into account $265,442 of income from NTEF, equal to the gross receipts shown on NTEF's unsigned 2013 return. By contrast, petitioner's 2013 return shows nonpassive income from NTEF of $62,627 and a section 179 deduction from that entity of $18,034. The nonpassive income petitioner reported from NTEF equals the ordinary business income shown on the corporation's unsigned 2013 return (gross receipts of $265,442 less returns and allowances of $692 and total deductions of $202,123).

The total deductions shown on NTEF's unsigned return include vehicle expenses of $14,477, travel expenses of $12,078, and meals and entertainment expenses of $7,619. Because those expenses are subject to section 274(d), we will not take them into account in computing petitioner's income from NTEF for 2013.

[*55] Nor will we allow him the section 179 deduction or the offset for sales returns and allowances shown on NTEF's unsigned 2013 return. But, consistent with our treatment of the expenses of other entities for the years in issue, we will take into account 18.3% of the other expenses shown on that return ($202,123 – $14,477 – $12,078 – $7,619 = $167,949). We thus conclude that petitioner's income from NTEF for 2013 was $234,707 ($265,442 – ($167,949 × .183)).

IV.    Rental of Loma Alta Property; Other Deductions and Losses

In computing the deficiency for 2011 that he asserted in his amended answer, respondent took into account the $19,800 of stipulated income from petitioner's rental of the Loma Alta property but did not take into account the capital loss carryover deduction shown on petitioner's return or the expenses underlying the reported loss from the rental of the Loma Alta property. Respondent's deficiency does allow petitioner the stipulated loss of $53,154 from the sale of that property but allows only a standard deduction rather than the itemized deductions petitioner claimed.

In computing the increased deficiency asserted in his amended answer for 2012, respondent did not allow the capital loss or NOL carryforward shown on petitioner's unsigned 2012 return and, again, allowed the standard deduction instead of the itemized deductions shown on that return. Similarly, in computing

**[\*56]** the increased deficiency for 2013 he asserted in his amended answer, respondent allowed the standard deduction rather than the itemized deductions shown on petitioner's return for the year.

In his opening brief, petitioner made no argument in support of the capital loss carryover deductions shown on his 2011 and 2012 returns, the $69,934 loss deduction from the rental of the Loma Alta property shown on his 2011 return, or the itemized deductions shown on the returns for all three of the years in issue. We will thus treat him as having conceded those issues. We will also hold petitioner to his stipulation of 2011 rental income from the Loma Alta property.

Respondent claims that petitioner has not adequately substantiated the NOL carryover shown on petitioner's unsigned 2012 return. But respondent has conceded the 2011 loss that gave rise to the carryover. Although petitioner has thus adequately substantiated the claimed NOL carryover, we nonetheless conclude that he is not entitled to any NOL carryover from 2011 to 2012 because his business income for 2011, as determined above, is more than enough to offset even the increased loss from the sale of the Loma Alta property.

[*57] V.    Self-Employment Tax on 2012 and 2013 Income From GASP

Section 1401(a) imposes a tax "on the self-employment income of every individual". An individual's "net earnings from self-employment" are included in his self-employment income unless specifically excluded. Sec. 1402(b). Subject, again, to specified exceptions, section 1402(a) provides:

> The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member * * *

Section 1402(a)(13) provides that, in computing a partner's distributive share of income or loss described in section 702(a)(8), "there shall be excluded the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services".

On brief, respondent concedes that petitioner is not subject to self-employment tax on his distributive share of the income of GEJ, LLC, Greenville GP, or Pemberly Partners. He also concedes that petitioner is not liable for self-employment tax on his distributive share of GASP's income for 2011. Given those

[*58] concessions, we understand respondent now to be contending that petitioner's only income for the years in issue that is subject to self-employment tax is his share of GASP's income for 2012 and 2013.[8]

Petitioner's arguments concerning his liability for self-employment tax have evolved as he has filed successive briefs. In his opening brief, petitioner claimed that income from a partnership is never subject to self-employment tax. The plain terms of section 1402(a) refute that argument.

In his reply brief, after repeating the argument he made in his opening brief, petitioner added another argument grounded in section 1402(a)(13). He claims that his "interests are in the nature of limited partnership interests."

In his response to respondent's sur-reply brief, petitioner goes further, claiming that his interest in GASP is not only "in the nature of" a limited partner interest, but actually is a limited partner interest. He asserts that "a 'limited partner,' * * * is undisputedly what * * * [he] is with respect to Greenville Avenue Surgical Partners, Ltd."

Contrary to petitioner's assertion, we find no evidence in the record concerning GASP's nontax legal status or the nature of petitioner's interest in the

---

[8]Consistent with long-established policy, respondent does not contend that petitioner's income from his S corporations, ESOT, GJ MD, PA, and NTEF, is subject to self-employment tax. See Rev. Rul. 59-221, 1959-1 C.B. 225.

[*59] entity. Petitioner made no proposed findings of fact on those points. (Indeed, contrary to the mandate of Rule 151(e)(3), his opening brief made no proposed findings of fact at all.) The parties stipulated that GASP "was a partnership for federal income tax purposes during the tax years at issue" and that petitioner "personally owned a 99% interest in GASP" during those years. But we find nothing in the stipulation of facts that identifies GASP's status under State law or the specific nature of petitioner's interest in the entity (other than its proportion in relation to other interests).

If petitioner means to argue that, whatever the precise nature of his interest in GASP under State law, that interest is sufficiently akin to a limited partner interest to be treated as such for purposes of section 1402(a)(13), we disagree. As we explained in Renkemeyer, Campbell & Weaver, LLP v. Commissioner, 136 T.C. 137, 148 (2011), since Congress enacted section 1402(a)(13) in 1977, State laws have been amended to allow new types of unincorporated entities that provide liability protection to all of their owners, such as limited liability companies and limited liability partnerships. The rise of those entities has forced us to consider when interests in them are sufficiently analogous to limited partner interests for income attributable to them to be covered by the section 1402(a)(13) exclusion. For that purpose, we adopted in Renkemeyer a functional test that

**[\*60]** looks to the relationship of the owner to the entity's business. Under that test, an owner's protection from claims against the entity is not enough to qualify the owner as a limited partner for purposes of section 1402(a)(13). Id. at 147. Instead, relying on the legislative history of section 1402(a)(13), we concluded in Renkemeyer that an interest other than a limited partner interest could be treated as such for purposes of that section only if the holder is merely a passive investor in the entity who does not actively participate in the entity's business operations. Id. at 150.

Petitioner has not established that he was merely a passive investor in GASP. Indeed, according to petitioner's own testimony, he used GASP during 2012 and 2013 to receive income from refractive surgeries he performed on behalf of LVI. Thus, he actively participated in GASP's business during those years.

Because petitioner has not established that he was a limited partner in GASP and the record does not support treating him as a limited partner under Renkemeyer's functional test, we conclude that petitioner's income from GASP for each of 2012 and 2013 is self-employment income subject to the tax imposed by section 1401(a).[9]

---

[9]Under the circumstances, we need not decide whether a de jure limited partner must satisfy the functional test of Renkemeyer, Campbell & Weaver, LLP

(continued...)

[*61] VI.    Additions to Tax

Section 6651(a)(1) provides for an addition to tax when a taxpayer fails to file a timely return. The addition to tax is a prescribed percentage of the amount of tax required to be shown on the return. Section 6651(a)(2) imposes an addition to tax for failure to pay timely the tax shown on a return. That addition to tax is a prescribed percentage of the tax actually shown on the return. In each case, the prescribed percentage increases up to a stated maximum based on the extent of the delinquency of filing or payment. Section 6654 imposes an addition to tax on a taxpayer who does not make estimated tax payments as required to satisfy the portion of his tax liability not covered by withholding.

The addition to tax for failure to file or failure to pay tax timely does not apply if the taxpayer shows that his failure "is due to reasonable cause and not due to willful neglect". Sec. 6651(a)(1) and (2). In regard to the reasonable cause exception to the addition to tax for failure to file, section 301.6651-1(c)(1), Proced. & Admin. Regs., provides: "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is due to a reasonable cause."

---

[9](...continued)
v. Commissioner, 136 T.C. 137 (2011), to be entitled to the sec. 1402(a)(13) exclusion.

**[*62]** The Commissioner bears the burden of production with respect to penalties. Sec. 7491(c). To meet that burden, he must establish the appropriateness of imposing the penalty either through the production of evidence or reliance on concessions by the taxpayer. Higbee v. Commissioner, 116 T.C. 438, 446 (2001); Oria v. Commissioner, T.C. Memo. 2007-226, 2007 WL 2318367, at *4. "[O]nce the Commissioner meets his burden of production, the taxpayer must come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." Higbee v. Commissioner, 116 T.C. at 447. Therefore, the taxpayer bears the responsibility for raising defenses such as reasonable cause. Id. at 446.

The taxpayer also bears the responsibility for assigning error to a penalty determination in the first instance. As we observed in Swain v. Commissioner, 118 T.C. 358, 363 (2002): "Unless the taxpayer puts the penalty into play * * * (by assigning error to the Commissioner's penalty determination), the Commissioner need not produce evidence that the penalty is appropriate, since the taxpayer is deemed to have conceded the penalty." Because petitioner has conceded his liability for additions to tax under section 6654 and did not assign error to respondent's determination of additions to tax under section 6651(a)(2), the additions to tax under section 6651(a)(1) for failure to timely file a return are

**[\*63]** the only ones "in play" in regard to which respondent bears the burden of production.

We conclude that respondent has met that burden. Even with extensions, petitioner's return for each calendar year was due in mid-October of the following year. See sec. 6072(a); sec. 1.6081-4(a), Income Tax Regs. The transcript of petitioner's account for 2011 does not show the filing of a return. Although the parties stipulated a copy of an original return for that year, the copy evidences receipt by the IRS only in August 2015. The transcript of petitioner's account for each of 2012 and 2013 shows the filing of a "duplicate" return only after respondent's preparation of a substitute for return for the year under section 6020(b). According to the transcripts, petitioner's returns for 2012 and 2013 were not filed until 2015 (in August and October, respectively).

Petitioner makes no explicit argument that he had reasonable cause for his failure to file timely returns for the years in issue. In a portion of his opening brief captioned "Background Facts", petitioner states that, in the face of "uncertainties" arising from financial difficulties Pemberly encountered, he "and Mr. Daffron determined that waiting for clarification made sense." Respondent reads that statement as an apparent attempt to explain the delay in filing petitioner's returns. If that was petitioner's intent, we agree with respondent that Pemberly's financial

**[\*64]** difficulties do not establish a reasonable cause defense. Any questions raised by Pemberly's circumstances about what petitioner should have reported on his returns did not justify his failure to file those returns on time. The resolution of uncertainties after the extended due date for petitioner's returns could have been addressed by filing amended returns as necessary. Waiting indefinitely to file those returns did not demonstrate "ordinary business care and prudence". Cf. sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

We therefore conclude that petitioner is liable for additions to tax for each of the years in issue under sections 6651(a)(1) and (2) and 6654.

Decision will be entered under

Rule 155.